(No. 66346.—

HAROLD F. McGRATH, Appellee, v. ROBERT P. FAHEY *et al.*, Appellants.

*Opinion filed December 6, 1988.—Rehearing denied January 30, 1989.*

Cassiday, Schade & Gloor, of Chicago (Michael J. Gallagher, Bruce M. Wall and Judith A. Schieber, of counsel), for appellants.

William J. Harte, Ltd., and Joyce & Kubasiak, P.C., both of Chicago (William J. Harte and Edward T. Joyce, of counsel), for appellee.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In the circuit court of Cook County, plaintiff, Dr. Harold F. McGrath, filed a complaint against defendants, Robert P. Fahey and First Security Bank of Glendale Heights, now known as Du Page County Bank of Glendale Heights (First Security), alleging the intentional infliction of emotional distress. The circuit court dismissed the complaint for failure to state a cause of action, and plaintiff appealed. The appellate court reversed (163 Ill. App. 3d 584), stating that a jury could legitimately find defendants' conduct so outrageous as to support the claim. Pursuant to Supreme Court Rule 315 (107 Ill. 2d

R. 315), we allowed defendants' petition for leave to appeal.

We herein set forth the factual allegations of the complaint. Prior to January 1982, plaintiff and Terrace Management, Inc. (Terrace), constructed and managed 16 six-unit rental apartment buildings. During or after January 1982, plaintiff and Terrace decided to sell the buildings, and their accountant introduced them to James Elliot, who was to attempt to arrange the realty sale. Elliot proposed a sale and financing agreement (realty contract) which was to involve multiple parties, including First Security (in which Elliot acquired a controlling interest in January 1982) and Manning Savings and Loan Association (Manning Savings). At all times relevant to the complaint, Manning Savings, Harold Ticktin (the president, a director and a member of the loan committee of Manning Savings), First Security, Elliot, and Kevin Kehoe (an officer of First Security) were together directly or indirectly engaged in a variety of joint or otherwise related business transactions.

Shortly after plaintiff's accountant introduced Terrace and him to Elliot, Elliot, First Security, Manning Savings, Kehoe and Ticktin developed a scheme to defraud McGrath and Terrace in connection with the realty contract. The scheme to defraud (which allegedly caused plaintiff and Terrace to lose $4 million) was already the subject of separate litigation when the instant complaint was filed, and plaintiff appended portions of his counterclaim, cross-claim and third-party complaint in the other litigation to his complaint in the instant case.

Prior to learning of the scheme to defraud, plaintiff had placed 10 certificates of deposit (CD's) with First Security totaling over $1 million. These CD's were in the names of plaintiff and his wife in their capacities as trustees or fiduciaries under various pension, profit-sharing and trust accounts and in the name of the McGrath

Clinic, S.C. None of these funds had any connection whatsoever with the realty contract.

Each of the CD's matured in April 1983. However, when on May 18, 1983, plaintiff sought the partial withdrawal and partial reinvestment of these funds, he was told that no one was available with the authority to handle such transactions. The following day, plaintiff spoke by telephone with Robert P. Fahey, who was president of First Security and acting as an agent thereof. Fahey advised plaintiff that First Security would not permit any of the funds to be withdrawn because of problems that had developed in connection with the realty contract. Fahey said this despite plaintiff's insistence that the CD's had no connection with the realty contract and that the CD's were primarily being held in trust for plaintiff's children and employees.

On Friday, May 20, 1983, plaintiff contacted Wayne Kwiat, an attorney he had retained in connection with the realty contract, and informed Kwiat that First Security had refused to release the CD funds. On May 23, Kwiat, plaintiff and Dunn Glick (an attorney with a private law firm acting as an agent of First Security) met. Plaintiff explained to Glick that the CD's were unrelated to the realty contract and were being wrongly withheld. Plaintiff also told Glick that plaintiff's father had died young from a heart attack, that heart problems ran in his family, that the CD dispute was making him extremely anxious, and that he was concerned about the effect that this anxiety would have on his health.

Glick refused to discuss the CD's, stating that he would discuss only problems that had emerged in the realty contract. Glick did, however, make threats to plaintiff. Glick stated that plaintiff must assign to First Security his interest in certain second mortgages held in connection with the realty contract because if plaintiff refused, First Security not only would refuse to release

the CD funds but also would "financially ruin him and his medical practice." Following this meeting, plaintiff became even more concerned about the CD's, and he discussed with Kwiat the possibility of retaining a litigation attorney to handle the matter.

The following day, on May 24, 1983, plaintiff consulted attorney Edward Joyce and described the CD dispute and the anxiety he was experiencing relating to the dispute. Joyce attempted to resolve the matter immediately because plaintiff was becoming physically ill during the meeting. Joyce phoned Glick and asked for assurance that the CD funds would be released, stating that First Security had no legal right to withhold the funds. Glick refused to give any assurance. Joyce then dispatched by messenger a letter (signed by plaintiff and his wife) demanding that the CD funds be transferred to the Northern Trust Company of Chicago.

On May 25, a law partner of Glick messengered a response letter to Joyce concerning the CD's. The letter stated that an immediate release would not take place because First Security would first need "execution of the appropriate documentation and delivery of the original CD's."

That same day, plaintiff suffered a massive heart attack and underwent open-heart surgery. Later that afternoon, a law partner of Joyce telephoned Glick and advised him of the heart attack. Joyce's colleague emphasized that the signatures of plaintiff and his wife on Joyce's May 24 letter were sufficient documentation to permit transfer of the CD funds. Glick responded that the refusal to transfer funds had nothing to do with signatures or documentation. Glick stated that First Security would not transfer the CD funds until plaintiff assigned to First Security certain second mortgages held in connection with the realty contract. Glick also threat-

ened to "tie up the funds for five years" if plaintiff did not assign his interest in the second mortgages.

On May 26, 1983, Joyce spoke with a law partner of Glick. Glick's colleague agreed on behalf of First Security to transfer the CD funds, and the transfer was finally arranged.

After First Security transferred the CD funds as requested, a new problem developed with regard to three other First Security accounts, which accounts had no connection with the realty contract. First Security (through Fahey) refused to permit the transfer of any funds from a checking account owned by him and his wife, a checking account owned by Terrace, and an insured money market fund owned by a trust in which plaintiff had an interest. In particular, First Security refused to honor eight drafts drawn upon the three above-mentioned accounts, despite earlier assurances to the contrary and despite the sufficiency of the funds to cover the drafts.

In August 1983, while plaintiff was home recuperating from open-heart surgery, Fahey telephoned plaintiff several times regarding the dispute between First Security and plaintiff. Plaintiff told Fahey he did not wish to speak to him, but Fahey nevertheless persisted in calling plaintiff during plaintiff's recuperation. Subsequently, Joyce contacted the attorneys for First Security and directed that all future communications from First Security or its agents to plaintiff be made through Joyce's law firm.

On August 16, 1983, First Security filed a lawsuit against plaintiff and Elliot relating to the realty contract. Fahey then advised plaintiff that, based upon the lawsuit, First Security was setting off the three accounts mentioned above against the amounts it was claiming due. First Security refused to alter its position in this regard despite subsequent information that its refusal to

release the accounts was placing additional stress upon plaintiff.

In Illinois the tort of intentional infliction of emotional distress was first recognized in *Knierim v. Izzo* (1961), 22 Ill. 2d 73, in which a widow was permitted to maintain such an action against the murderer of her husband. It was not until 1976, however, that this court (relying on Restatement (Second) of Torts §46 (1965)) outlined the requirements for the tort.

First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress. (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 90.) "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity." Restatement (Second) of Torts §46, comment *j*, at 77-78 (1965).

It is thus clear that the tort does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Restatement (Second) of Torts §46, comment *d*, at 73 (1965).) Beyond this well-established limitation, however, application of the "outrageousness" requirement is necessarily difficult due to its vagueness. Nevertheless, Illinois case law, as well as comments to section 46 of the Restatement (Second) of Torts (1965), provides guidance in this regard. It is clear, for example, that the degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous. The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed

outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment. Threats, for example, are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out than when made by someone in a comparatively weak position. The Restatement mentions police officers,. school authorities, landlords and collecting creditors as examples of the many types of individuals who may be positioned to exercise power or authority over a plaintiff. Restatement (Second) of Torts §46, comment e, at 74 (1965).

Illinois cases in which intentional infliction of emotional distress has been sufficiently alleged have in fact very frequently involved a defendant who stood in a position of power or authority relative to the plaintiff. This concern was aptly addressed in *Milton v. Illinois Bell Telephone Co.* (1981), 101 Ill. App. 3d 75, as follows:

"As Dean Prosser pointed out, 'The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion.' [Citations.]" 101 Ill. App. 3d at 79.

In *Milton*, the plaintiff claimed that, to coerce him into falsifying work reports, his superiors engaged in an extensive course of harassing and discriminatory conduct (which plaintiff set forth in much detail). In allowing the complaint to stand, the court emphasized that "[i]t is the alleged abuse of power by a large corporation over one of its front line employees which aggravates the outrageousness of the conduct alleged in this case." 101 Ill. App. 3d at 79.

Also insightful on the issue of abuse of power or authority is *Eckenrode v. Life of America Insurance Co.*

(7th Cir. 1972), 470 F.2d 1. *Eckenrode* involved an insurance company's alleged attempt to coerce a widow into compromising a claim under her husband's life insurance policy, through a multitude of abusive tactics including conduct which the court found amounted to economic coercion.

Of course, when threats of improper use of power or authority form the crux of an action for emotional distress, it should appear that the plaintiff reasonably believed that those threats would be carried out. Thus, in *Plocar v. Dunkin' Donuts of America, Inc.* (1981), 103 Ill. App. 3d 740, a substantial factor in the court's decision to uphold dismissal of the complaint was the conclusion that the threats were mere idle ones. The court stated:

> "Even if it is true that [defendant's agent, a district manager] threatened to file false reports about [plaintiff] to [defendant], [plaintiff] never alleged that these threats were carried out or that she was reasonably in fear of losing her [franchise] store." 103 Ill. App. 3d at 747.

When a defendant in an action for emotional distress is accused of improperly using a position of power or authority, courts view this allegation in conjunction with another significant consideration: whether the defendant reasonably believed that his objective was legitimate. Although the reasonable belief that his objective is legitimate does not provide a defendant *carte blanche* to pursue that objective by outrageous means (see, *e.g.*, *Sherman v. Field Clinic* (1979), 74 Ill. App. 3d 21), it is a substantial factor in evaluating the outrageousness of his conduct. Creditors, for example, though often able to exercise power over another, are given substantial latitude as to the pressure they can exert in order to collect payment to which they are legally entitled. This is true even though the methods employed "may result in some inconvenience, embarrassment or annoyance to the

debtor." *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 92; see generally Restatement (Second) of Torts §46, comment *g* (1965).

The significance of the legitimacy of the defendant's objective has also been illustrated in the employer-employee context. For example, in *Gibson v. Chemical Card Services Corp.* (1987), 157 Ill. App. 3d 211, the plaintiff alleged that the defendant employer had intentionally inflicted upon her severe emotional distress in conjunction with an investigation of her purported credit card theft. In finding that no cause of action had been adequately alleged, the court placed heavy emphasis on the legitimacy of the employer's objectives, stating:

> "[The defendant company] had a legitimate interest in solving prior employee thefts and preventing future thefts. *** Certainly, such investigations cannot be conducted without creating some distress, and the mere fact of [the defendant's] apparent or actual authority over the plaintiff to order her to cooperate with the investigation because of the employer/employee relationship does not, under these circumstances, establish extreme or outrageous conduct ***." 157 Ill. App. 3d at 219.

The reasonableness of a defendant's belief that his objective (such as the collection of a *purported* debt) is legitimate may occasionally depend upon an interpretation and application of a rule of law (such as a law of debtor-creditor relations). Even if this situation should arise in a jury case (which this case may not become, neither party as yet having requested a jury), the court, not the jury, must make this determination. Of course, if the inquiry is a mixed question of law and fact, the jury should resolve the factual issues under proper instructions from the court. See generally 34 Ill. L. & Prac. *Trials* §111 (1958).

Also of serious consideration is a defendant's awareness that the plaintiff is peculiarly susceptible to emo-

tional distress, by reason of some physical or mental condition or peculiarity. Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress. *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85.

We have thus set forth numerous considerations which may enter into a determination whether a defendant's conduct is extreme and outrageous. We do not mean to imply that these considerations are exclusive, however, nor do we mean to imply that any or all of these factors are necessarily critical to a cause of action for intentional infliction of emotional distress. The outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case.

We now turn to a determination whether, in view of the considerations set forth above, defendants' conduct as pleaded could be deemed extreme and outrageous. If so, the complaint should not have been dismissed for failure to plead this element. In ruling on a section 2—615 motion to dismiss (Ill. Rev. Stat. 1987, ch. 110, par. 2—615), a court should deny the motion unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover. (*Ogle v. Fuiten* (1984), 102 Ill. 2d 356.) In making this determination, the court is to interpret the allegations of the complaint in a light most favorable to the nonmovant. (*Iverson v. Scholl, Inc.* (1985), 136 Ill. App. 3d 962.) Having examined the complaint, we conclude that an "extreme and outrageous" course of action has been adequately alleged, as discussed below.

At the forefront of the conduct giving rise to plaintiff's complaint is a scheme to defraud him and his business colleague (Terrace) out of millions of dollars. The

scheme to defraud allegedly occurred among individuals who, it can be inferred by virtue of their position as officers and board members of major financial institutions, were quite knowledgeable in the various means of financing major real estate transactions. By contrast, plaintiff and Terrace allegedly were not knowledgeable with respect to matters concerning the sale of real estate, "especially with respect to real estate matters as complex as [the realty contract]." Obviously, the grounds for an action in fraud cannot be equated with grounds for an action for intentional infliction of emotional distress. In the instant case, however, the fraud was merely the initial activity in a course of conduct giving rise to the cause of action.

After defendant First Security and others had induced plaintiff and Terrace to sell realty under circumstances in which their ability ever to be fully paid for the property was jeopardized, defendants allegedly engaged in conduct very much akin to extortion. Defendants allegedly knew that the CD's had absolutely no connection with the realty contract. Defendants also knew that plaintiff held those CD's only in a fiduciary capacity and thus had all the duties and obligations which any fiduciary has toward those on whose behalf he acts. Yet defendants, without any tenable legal justification whatsoever, used the CD funds as a weapon, refusing to release them in order to coerce plaintiff into assigning to First Security certain second mortgages—mortgages which were the means by which plaintiff might otherwise conceivably recover some payment for the realty he had surrendered. Moreover, defendants' wrongful refusal to release the funds involved an ongoing course of conduct during which plaintiff's anxiety should reasonably have been expected to intensify. When plaintiff initially sought to retrieve the CD funds, he received only the excuse that "no one is available with the authority to handle

these transactions." Eventually, agents of First Security acknowledged their actual illegitimate motive: to coerce plaintiff into signing over the second mortgages. Additional threats were made to tie up the funds for five years and to financially ruin plaintiff and his medical practice. The conduct persisted despite the alleged fact that defendants had reason to believe that plaintiff might well be susceptible to heart disease, and even after plaintiff in fact had a severe heart attack. This conduct was intermixed with delay tactics; at one point, defendants led plaintiff to believe that only a lack of "proper documentation" precluded release of the CD funds, but defendants later asserted again that defendant would not see the funds until he assigned the second mortgages.

Even after First Security eventually yielded to demands of plaintiff's attorneys for release of the CD funds, defendants continued to engage in abusive conduct, refusing to permit plaintiff to transfer funds in a checking account and money market account, and refusing to honor drafts drawn on these accounts despite assurances that the drafts would be honored. Additionally, and while knowing that he was acting against plaintiff's wishes, Fahey telephoned plaintiff concerning the dispute while plaintiff was at his home recuperating from heart surgery. Regarding these telephone calls, we agree with the appellate court that it may logically be inferred from defendants' prior course of conduct that the calls concerned defendants' attempt to coerce plaintiff into assigning his second mortgages.

This conduct could easily be deemed outrageous by a jury. This is particularly true in view of the apparent economic power which defendants exercised over plaintiff, in view of the alleged total lack of any legal justification for the objective which defendants were attempting to

achieve, and in view of defendants' alleged knowledge of plaintiff's special susceptibility.

We further note that, while it is not alleged that all of the abusive conduct and each threat directly involved Fahey, it is sufficiently clear from the complaint that Fahey himself was actively involved in, and indeed directing, the course of conduct of First Security and its attorneys. It was Fahey who first refused to surrender the CD funds due to the realty contract dispute, it was Fahey who called and harassed plaintiff with phone calls while plaintiff was recuperating, and it was through Fahey that First Security dishonored checks for which there were sufficient funds and froze plaintiff's other deposits with First Security.

It is obvious from the above-summarized allegations of the complaint that a jury could reasonably find that defendants' conduct was outrageous and that defendants intended to inflict upon plaintiff severe emotional distress. It is equally clear that plaintiff did in fact suffer severe emotional distress, and a jury could reasonably conclude that such distress proximately resulted from defendants' course of conduct.

For the foregoing reasons, the decision of the appellate court is affirmed.

*Affirmed.*