943 F.2d 54
 57 Fair Empl.Prac.Cas. (BNA) 288
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Elaine R. TOZZI, Plaintiff-Appellant,
v.
JOLIET JUNIOR COLLEGE, Robert Burke, Doctor and Salvadore A.
Gutierrez, Defendants-Appellees.
 No. 89-3155.
 United States Court of Appeals, Seventh Circuit.
 Submitted Aug. 20, 1991.*
Decided Aug. 30, 1991.
 
 Before CUMMINGS, POSNER and MANION, Circuit Judges.
 
 ORDER
 
 1
 Elaine R. Tozzi appeals the district court's grant of summary judgment to the appellees on her claims brought pursuant to Title VII, 42 U.S.C. § 2000e, et seq. We have reviewed the record, and we affirm for the reasons stated in Judge Grady's thorough district court order.
 
 
 2
 The appellees have pointed out, in their jurisdictional statement and as an affirmative defense in their answer to the complaint, that Ms. Tozzi did not file her charge with the EEOC within 180 days as required by 42 U.S.C. § 2000e-5(e). We write only to note existence of a Worksharing Agreement between the Illinois Department of Human Rights and the EEOC which extends the time for filing to 300 days. See Marlowe v. Bottarelli, No. 90-2858, slip op. (7th Cir. August 7, 1991); Sofferin v. American Airlines, Inc., 923 F.2d 552 (7th Cir.1991).
 
 
 3
 We affirm for the reasons stated in the attached memorandum order.
 
 
 4
 AFFIRMED.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE NORTHERN DISTRICT OF ILLINOIS
 EASTERN DIVISION
 
 5
 Elaine R. Tozzi, Plaintiff,
 
 
 6
 v.
 
 
 7
 Joliet Junior College, Dr. Robert Burke, and Salvadore A.
 
 
 8
 Gutierrez, Defendants.
 
 No. 88 C 10385
 August 10, 1989
 MEMORANDUM OPINION
 
 9
 This employment discrimination case comes before us on defendants' motion for summary judgment. For the reasons given below, we grant the motion.
 
 FACTS
 
 10
 Plaintiff Elaine Tozzi ("Tozzi") became a part-time English instructor at Joliet Junior College ("the College") in the fall of 1982. For the next four years, she was given a series of one-semester contracts to teach one or more English classes at the College. In most of these semesters, she received an in-class visit and evaluation from her immediate supervisor and chairman of the English department, Dr. Robert Burke ("Burke"). On a six point scale, ranging from 1 (lowest) to 6 (highest), Burke typically gave Tozzi a "5" rating. During the 1986-87 academic year and possibly earlier, the College also asked students to evaluate the performance of faculty members in the classroom. Teachers were rated in twelve categories on a scale from 1 (lowest) to 5 (highest). An average of the students' scores in each category was computed, and a teacher's "total rating" was calculated by averaging scores across all twelve categories. Students were also invited to make written comments. In the fall of 1986, one of her classes gave Tozzi a total rating of 1.85. This was an exceptionally low score; the ratings for the other twenty-two part-time English instructors at Joliet that autumn ranged from 3.51 to 4.72.[1] The ratings of the other teachers, moreover, seemed essentially unaffected by the sex of the teacher; the fourteen female teachers had an average overall rating of 4.26 (ranging from 3.51 to 4.68); the nine male teachers had an average overall rating of 4.32 (ranging from 3.74 to 4.72). The students' written comments about Tozzi's performance were harshly critical: "Tonight for the first [seventy minutes] she was in the class for 6 minutes. It was not the first time." "The instructor does not present the material well. Does not go over text material. Gives trick test--rarely based on chptr. objectives. Does not come to class on time, and is rarely prepared." "... [Tozzi] seems very distracted and disorganized."
 
 
 11
 After reviewing the evaluations, the College's Vice-President of Instruction, Dr. James Lepanto ("Lepanto") concluded that Tozzi should not be given another semester contract.[2] He discussed this conclusion with Burke, who suggested that Tozzi's contract be renewed for the spring semester, and that her performance be monitored for improvement. Lepanto agreed to this approach. Tozzi was re-employed for the spring semester and was shown her evaluations from the fall.
 
 
 12
 Tozzi's spring evaluations improved, but were still significantly poorer than those of all her colleagues. Her overall average rating was 2.89. The average rating received by the other thirteen female instructors was 4.35, ranging from 3.83 to 5.00. The overall average rating received by the seven male instructors was 4.24, ranging from 3.72 to 4.62. After reviewing the spring evaluations, Lepanto concluded that Tozzi should not be offered further contracts to teach at the College. Burke agreed with this conclusion, and informed Tozzi on April 27, 1987 that she would not be offered a contract to teach that fall because of her student evaluations. On May 11, 1987, Burke told Tozzi that her summer contract had been canceled due to low enrollment in the classes she was to teach.
 
 
 13
 During May and June, Tozzi contacted Burke a number of times; she mailed two letters to his home, sent a poem to his office, and sought him out several times at a Joliet tavern. The parties have divergent interpretations of these communications. The defendants appear to suggest that Tozzi was flirtatious with Burke, while Tozzi maintains that she was simply attempting through friendly, informal communication to get her job back. The parties do not dispute, however, that in June Burke discouraged Tozzi from sending further letters to his home or visiting him at the tavern.
 
 
 14
 In August, Tozzi applied to the Illinois Bureau of Employment Security for unemployment benefits. Her request was denied. In the early fall of 1987, Tozzi complained to the Vice-President, President, and Board of Trustees of the College about her dismissal. Subsequently, in October 1987, Tozzi sought Burke out in the tavern where she had visited him earlier, and asked him for a letter of recommendation; he refused her request.
 
 
 15
 Sometime in the late summer or fall of 1987, Tozzi decided that Burke had made a number of sexual overtures to her during the previous academic year. According to Tozzi, there were three such incidents. In January 1987 Tozzi asked Burke (allegedly on behalf of her students) whether her three-evenings-a-week class could be rescheduled as a two-evenings class. Burke refused the request, referring to "space usage" constraints. Although the comment was made in front of two other College employees, and although Tozzi did not infer any sexual connotations from the remark at the time, she now believes that Burke's remark was a veiled suggestion that Tozzi's request would be granted if she would open up her "personal space" to Burke. On April 27, 1987, after Burke informed Tozzi that she would not be re-hired for the fall semester, Tozzi asked Burke what she could do to rectify the problems of low student ratings. Burke suggested that Tozzi might "change" her "approach." On May 11, 1987, when Burke told Tozzi that her last summer class had been canceled due to low enrollment, Tozzi made some inquiry as to whether any positions might open. Burke allegedly replied, "I have my needs." Tozzi maintains that she was not offended by either of these statements at the time they were made, but later concluded that both statements were subtle attempts to let her know that her chances of employment would improve if she became sexually compliant.
 
 
 16
 On February 8, 1988, the plaintiff filed charges against the College and Burke with the Equal Employment Opportunity Commission ("EEOC"). On September 1, 1988, she received a right-to-sue letter from the EEOC, and on December 13, 1988, she filed suit against defendants, alleging several violations of Title VII as well as intentional infliction of emotional distress.
 
 DISCUSSION
 
 17
 We note that Tozzi's EEOC claim may not have been timely, and that her case before us may therefore be precluded by the relevant statute of limitations. However, since defendants' motion for summary judgment does not raise a limitations defense, we will consider the substantive merits of the case.
 
 Discriminatory Testing
 
 18
 Tozzi contends that the use of student evaluation scores by the College as a basis for employment decisions constituted a discriminatory testing procedure under Title VII. Under the EEOC's guidelines, discriminatory treatment can arise from the use of "any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group...." 29 C.F.R. § 1607.3. "Adverse impact" means a "substantially different rate of selection ... which works to the disadvantage" of a protected group, such as women. 29 C.F.R. § 1607.16.
 
 
 19
 We believe that the facts advanced by Tozzi do not create a prima facie case of adverse impact. The student evaluations used by the College do not seem likely to produce different results for male and female teachers and, during the 1986-87 academic year at issue in this case, produced an almost identical range of evaluations for the College's male and female teachers--the plaintiff excepted. Because there is no showing of adverse impact, there is an insufficient basis to sustain Tozzi's allegations of a discriminatory evaluation method.
 
 Retaliation
 
 20
 Tozzi contends that the College's decision not to renew her teaching contract for the fall of 1987 was, in effect, a retaliatory discharge. She suggests that her low evaluation scores were simply a pretext for the true reason--her refusal to comply with Burke's alleged requests for sexual favors. Our analysis of this claim is governed by the shifting burdens test of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). That test first requires us to determine whether plaintiff can establish a prima facie case; that is, plaintiff must show (1) that she is a member of a protected class; (2) that she is otherwise similarly situated to members of the unprotected class; and (3) that she was treated differently from members of the unprotected class. If plaintiff can meet these requirements, then the burden of production shifts to defendants, who must articulate a legitimate, non-discriminatory reason for the discharge. If such a reason is provided, then the burden shifts back to plaintiff, who must show by a preponderance of the evidence that defendants' given reason is pretextual. See McMillan v. Svetanoff, No. 88 C 2335 (7th Cir. June 6, 1989).
 
 
 21
 In this case, Tozzi meets the first element of the prima facie case--as a woman she is certainly a member of a protected class. Assessing whether she is "similarly situated" to members of the unprotected class--in this case the male part-time English teachers at Joliet Community College--is difficult since hers is the only dismissal of which we are aware, and evidence of her performance is mixed. Assuming, however, that she has established a prima facie case, it is evident that the College has articulated an apparently legitimate, non-discriminatory reason for her discharge; namely, the low evaluation scores that Tozzi received in the fall of 1986 and the spring of 1987.
 
 
 22
 Tozzi's counter-argument that the evaluation scores were pretextual faces a number of obstacles. In the first place, defendants' uncontradicted facts indicate that one of Burke's superiors, not Burke himself, initiated the discussions that led to Tozzi's dismissal. In the second place, two of the three alleged propositions advanced by Burke came after he told Tozzi that her contract would not be renewed, undermining the plausibility of a retaliatory motive. Thirdly, Tozzi's only evidence that Burke was attempting to force her to be sexually accommodating is her own subjective belief that this was so. Burke's comments were, on their face, so innocuous that witnesses--and Tozzi herself--did not immediately notice any sexual innuendo whatsoever. Tozzi's subjective beliefs as to Burke's intent, standing alone, are simply insufficient to create a genuine issue of material fact. Andre v. Bendix Corp., 841 F.2d 172, 176 (7th Cir.) (subjective belief that discrimination occurred requires supporting evidence to make Title VII case), cert. denied, --- U.S. ----, 109 S.Ct. 144 (1988); McMillan v. Svetanoff, No. 88 C 2335 at p. 6.
 
 
 23
 Tozzi also contends that Burke retaliated against her in the fall of 1987, when he refused her request for a letter of recommendation, allegedly because Tozzi had complained to Burke's superiors about the non-renewal of her contract. An employer or an employer's agent can violate Title VII by refusing to provide a job reference in retaliation for complaints of discriminatory treatment. Pantchenko v. C.B. Dolge Co., 581 F.2d 1052, 1055 (2d Cir.1978); Rutherford v. American Bank of Commerce, 565 F.2d 1162 (10th Cir.1977). However, Tozzi concedes that, in her meetings with College officials during this period, she did not allege any acts of sexual discrimination or sexual misconduct by Burke. Thus, even assuming that Burke's refusal to provide a recommendation was retaliatory (and not based on Tozzi's evaluation scores or her behavior towards him during the summer and fall), Tozzi still has not alleged any conduct violative of Title VII.
 
 Sexual Harassment
 
 24
 A second, closely related allegation made by Tozzi is that the defendants "sexually harassed" her in violation of 29 C.F.R. § 1604. The EEOC's regulations define three types of sexual harassment that violate Title VII:
 
 
 25
 Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
 
 
 26
 29 C.F.R. § 1604.11(a).
 
 
 27
 Courts generally evaluate type (1) or type (2) harassment claims under the shifting burdens framework discussed above. Our analysis there applies here as well. Even if Tozzi can make out a prima facie case by establishing that Burke made sexual overtures, the defendants have articulated a plausible, non-discriminatory reason for not renewing her teaching contract. The only evidence that defendants' reason was pretextual is Tozzi's subjective belief that Burke presented her with a quid pro quo of sexual compliance in return for employment. For the reasons we have discussed, Tozzi's evidence is simply insufficient to sustain this claim.
 
 
 28
 To establish a type (3) harassment claim, the plaintiff must make a somewhat different showing. This type of claim--that sexual harassment created a hostile work environment--can succeed without showing that the plaintiff was fired, or denied some other benefit, because she did not comply with sexual demands. However, to establish a prima facie case that the alleged harassment created a hostile environment, the plaintiff must show as a threshold matter that the instances of harassment "rise to a level of 'hostility' offensive enough to be considered actionable." Scott v. Sears, Roebuck & Co., 798 F.2d 210, 213 (7th Cir.1986). In the Supreme Court's words, "in order for [this type of] sexual harassment to be actionable, it must be sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create an abusive working environment.' " Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2406 (1986) (quoting Henson v. Dundee, 682 F.2d 897, 902 (11th Cir.1982)).
 
 
 29
 We do not believe that the facts as alleged by Tozzi satisfy this threshold requirement. The three remarks made by Burke between January and May of 1987 were, at worst, mild double entendres. The courts have found far more explicit and insulting behavior not to constitute sexual harassment, Scott at 213-14, and have pointed out that Title VII is not intended to make tastelessness illegal. Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983). Moreover, by Tozzi's own account, she did not realize that Burke's remarks had any sexual meaning at the time they were made. Logically, it follows that Burke's comments were not unwelcome, and could hardly have affected her work environment.
 
 
 30
 Tozzi has further alleged that Burke made sexually provocative comments when she met with him in a Joliet tavern in June 1987. These remarks, however, were not only outside the College's arena, but occurred after Tozzi no longer worked for the College. They consequently had nothing to do with Tozzi's work environment and cannot constitute a form of sexual harassment cognizable under Title VII.
 
 Denial of Unemployment Insurance Benefits
 
 31
 Tozzi also contends that Burke and the College interfered with her attempts to collect unemployment compensation and are responsible for her failure to do so. One problem with this allegation is the absence of any information in the complaint specifying what law the defendants might have violated if the allegations are true. A second problem is a jurisdictional one, since the unemployment issue was not raised in Tozzi's EEOC proceedings. Assuming, however, that these difficulties could be surmounted, we would still be compelled to deny this claim for lack of any factual support. The defendants have submitted a copy of the referee's report from the Illinois Department of Employment Security, setting forth the reasons for the state's denial of Tozzi's claim in the summer of 1987. The referee's report states that his reasons for denying Tozzi benefits are (1) that Tozzi had not actively searched for work during the summer of 1987, and (2) that there was a "reasonable assurance," based on the information Tozzi supplied, that she would have work during the 1987-88 academic year either at the College or as a substitute teacher in the local public schools. The record indicates that the College made no appearance in the proceedings. There is, accordingly, no evidence that the College interceded in any way to deny Tozzi benefits. Summary judgment must be granted on this issue.
 
 
 32
 Intentional Infliction of Emotional Distress
 
 
 33
 (i) Dr. Burke
 
 
 34
 Tozzi alleges that Burke tortiously and intentionally inflicted emotional distress upon her by interfering with her unemployment insurance claim, refusing to write her a letter of recommendation, and perhaps by his role in not renewing Tozzi's contract at the College.
 
 
 35
 The tort of intentional infliction of emotional distress has been recognized in Illinois since 1961, when the Illinois Supreme Court held in Knierim v. Izzo, 22 Ill.2d 73, 174 N.E.2d 157 (Ill.1961), that a widow could collect damages from the defendant after he threatened to kill her husband, and then actually carried out the murder. In that opinion, the Supreme Court made it clear that persons could be liable under the tort only for acts truly "outrageous," that is, an "unwarranted intrusion ... calculated to cause 'severe emotional distress' to a person of ordinary sensibilities...." Id. at 86, 174 N.E. at 164 (quoting Slocum v. Food Fair Stores of Florida, 100 So.2d 396 (Fla.1958)). Since that time, Illinois courts have consistently confined the tort to narrow limits, granting relief only where three conditions are met. First, the tortfeasor's conduct must be extreme: "The law intervenes only where the distress is so severe that no reasonable [person] could be expected to endure it." Public Finance Corp. v. Davis, 66 Ill.2d 85, 90, 360 N.E.2d 765 (Ill.1976). Second, the conduct must be intentional: the tortfeasor must "either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress." McGrath v. Fahey, 126 Ill.2d 78, 533 N.E.2d 806 (Ill.1988). Third, the tortfeasor's actions must be wrong and unjustified; that is, they must be "wholly lacking in social utility." Knierim, 22 Ill.2d at 85, 174 N.E.2d at 164. The courts have thus reserved relief under this tort theory to situations where the wrongdoing of the tortfeasor and the harm suffered by the victim satisfy stringent tests.[3]
 
 
 36
 We note that supervisors are held to a higher standard of accountability under this tort because their position of power may give a threat the color of extortion. McGrath, 126 Ill.2d at 87-88, 533 N.E.2d at 810. Moreover, we do not question the evident emotional distress Tozzi has suffered since losing her position at the College. Bearing these considerations in mind, however, we still do not find that any of Dr. Burke's alleged actions meet the three requirements outlined above for tortious infliction of emotional distress. The facts clearly show that it was the College's decision not to renew her contract, and not Burke's alleged double entendres, that produced Tozzi's distress, and, as we have concluded above, there was some clear justification for the College's decision. Had Burke's alleged propositions caused Tozzi great emotional distress in January, April, and early May, it is not likely that she would have pursued a social relationship with him in late May and early June, however much she wanted her job back.
 
 
 37
 Tozzi's allegation that Burke inflicted emotional distress upon her by conniving to deny her unemployment insurance application must fail for the complete lack of any factual support, as noted above. Her contention that Burke's refusal to write her a letter of recommendation was tortious must also fail. The social utility of reference letters arises from their discretionary nature. If a refusal to write such a letter (or, by extension, writing an unfavorable letter) could constitute a tort, references would lose all value. Consequently, Burke's refusal was not "outrageous" and was not tortious.
 
 
 38
 (ii) Salvadore Gutierrez
 
 
 39
 Tozzi has also alleged that Gutierrez tortiously and intentionally inflicted emotional distress upon her by telling "Burke to fire [Tozzi] because she sued him [Gutierrez] for discrimination." Plaintiff's Complaint at 4. It appears from the record that Tozzie was under the supervision of Gutierrez at SER Jobs for Progress, a CETA-funded program, in the early 1980s. Defendants' 12(1) Statement at p 22; Plaintiff's 12(m) Statement at p 22. Tozzie filed charges of sexual harassment against Gutierrez with the program's directors, but these charges were later dismissed. Id. Gutierrez contacted Burke in the fall of 1982, soon after Tozzi had begun teaching at the College, and told Burke that Tozzi "was not fit to teach and would bring discredit to the College." Defendants' Answers to Interrogatories at p 4. Burke allegedly responded by requesting Gutierrez to put his comments in writing. Gutierrez did not do so, and Burke never heard from him again. Id.
 
 
 40
 Tozzi contends that Gutierrez's actions caused her great emotional distress because they led to her eventual dismissal from the College. However, this could only be true if his comments led Burke to seek Tozzi's dismissal. There is no support in the record for such a claim. For four years after his conversation with Gutierrez, Burke consistently renewed Tozzi's teaching contracts and, indeed, gave her rather high marks as a teacher. As noted in our previous discussion, the events leading to Tozzi's dismissal originated with the college administrators, not Burke, and arose from Tozzi's low evaluation scores. Because there is no genuine issue as to these facts, we will grant judgment for Gutierrez.
 
 CONCLUSION
 
 41
 For the reasons stated above, we enter summary judgment on all counts in favor of defendants and against plaintiff.
 
 ENTER: /s/ John F. Grady
 United States District Judge
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). Appellant has filed a statement requesting oral argument. Upon consideration of that statement, the briefs, and the record, the request for oral argument is denied and the appeal is submitted on the briefs and record
 
 
 [1]
 Indeed, during the entire period of Tozzi's employment at the College (from the Fall of 1982 to the Spring of 1987), no teacher or instructor in the English Department received an average evaluation score of less than 3.00 in any course and had their contract renewed by the College. Defendant's Supplemental Response to Plaintiff's Interrogatory No. 8, verified by Lorna Merz, Personnel Director at Joliet Junior College
 
 
 [2]
 In Tozzi's Rule 12(m) statement, she suggests that it was Dean Brandolino, and not Lepanto, who reviewed her fall 1986 evaluations. We do not regard this is a material dispute because, as the discussion below makes clear, the important point is that Dr. Burke did not initiate the discussion about Tozzi's performance
 
 
 [3]
 Conversely, the courts typically dismiss claims that allege only the unexceptional injustices of everyday life. Such is the case of Miller v. Equitable Life Assurance Society, 181 Ill.App.3d 954, 537 N.E.2d 887 (1st Dist.1989), where the court noted:
 For approximately 3 1/2 years Graziani was surrounded by supervisors and coworkers who were inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair. While we do not condone such behavior, we do not believe that the conduct alleged is so outrageous in character and so extreme in degree as to go beyond all bounds of human decency.
 Id. at 957, 537 N.E.2d at 889. The court dismissed the plaintiff's count for intentional infliction of emotional distress.