2024 IL App (1st) 221046-U

1-22-1046

July 30, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| DR. RAJIV KANDALA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 L 9364 |
| | ) | |
| MACY ZARRAGA, a/k/a MACY MANUEL, | ) | Honorable |
| | ) | James E. Snyder, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1    *Held*:   The trial court's judgment in favor of plaintiff on defendant's counterclaim of intentional infliction of emotional distress is affirmed where the evidence did not establish the elements of the tort.

¶ 2    Following a bench trial, the trial court entered a $67,819.38 judgment for plaintiff, Dr. Rajiv Kandala, on his claim for deceptive practices against defendant, Macy Zarraga, also known as Macy Manuel, and found him not liable on defendant's counterclaim for intentional infliction

of emotional distress (IIED). Defendant appeals, contending the court erred in not finding plaintiff liable for IIED. For the following reasons, we affirm.

¶ 3    On August 23, 2019, plaintiff filed suit against defendant for breach of contract and deceptive practices. Regarding breach of contract, plaintiff alleged that on April 12, 2016, he loaned defendant $64,819.38, "payable without interest on demand," to enable her to purchase a condominium. Defendant failed to repay him. Plaintiff also alleged that defendant was liable for deceptive practices where on or about April 20, 2018, she tendered him a personal check for $64,819.38 that was dishonored due to insufficient funds and thereafter failed to pay him that amount. See 720 ILCS 5/17-1(E) (West 2018) (civil liability for deceptive practices). Plaintiff maintained that defendant's actions of delivering a check as payment for the loan, knowing that it would not be paid by the depository, and her willful refusal to provide funds constituted deceptive practices. Plaintiff sought damages totaling $64,819.38 plus attorney fees and costs. Appended to the complaint was an image of defendant's check number 764 for $64,819.38 payable to plaintiff, dated April 20, 2018, with the handwritten word "LOAN" in the "Memo" line.

¶ 4    On January 20, 2020, defendant filed counterclaims for IIED and forgery. In the IIED counterclaim, defendant alleged that the parties began dating in 2013. Plaintiff was the medical director of a skilled nursing facility where defendant was employed. In April 2016, he "gave" her $64,819.38 "to purchase a condominium." In November 2016, she ended their relationship. Plaintiff continued coming to defendant's residence and her office, against her will, through December 2017. Plaintiff had a key to defendant's residence and repeatedly entered without her consent. Defendant alleged that she was "so harassed and intimidated" by plaintiff that on or about September 24, 2017, despite owing nothing to him, she gave him a check for $50,000 "in a failed

attempt to free herself from his repetitious harassment." Plaintiff cashed the check on April 13, 2018.

¶ 5    Defendant further alleged that throughout 2018, plaintiff came to her new place of employment, another skilled nursing facility. Defendant felt "so harassed and intimidated" by plaintiff's conduct that on April 20, 2018, she wrote check number 764 payable to him, indicating $14,819.38 as the amount but leaving the "Dollars" and "Memo" lines blank. Plaintiff stole the incomplete check from her purse, changed the amount to $64,819.38, wrote that sum in the Dollars line, wrote "LOAN" in the Memo line, and submitted the check for payment despite knowing it "would not be paid." Plaintiff continued to visit defendant's workplace until November 2019, causing defendant severe or extreme emotional distress.

¶ 6    Defendant's counterclaim for forgery was based on the allegation that plaintiff altered check number 764. Defendant appended images of her check number 727 for $50,000 payable to plaintiff, dated September 24, 2017, and check number 764 for $64,819.38 payable to plaintiff, dated April 20, 2018, with "LOAN" written in the memo line.

¶ 7    The matter was set for trial on June 17, 2022. At the parties' request, the trial court held a bench trial on defendant's counterclaims after the bench trial on plaintiff's claims. As a result, the parties presented the evidence for their respective claims separately. Because defendant solely challenges the court's judgment on her IIED counterclaim, we omit the details of the trial on plaintiff's claims and proceed to the evidence presented regarding the counterclaim.

¶ 8    Regarding her IIED counterclaim, defendant testified she met plaintiff in 2011 while working at Continental Nursing, where he was the medical director. They began a romantic relationship in 2012. During their relationship, plaintiff gave her a watch and paid for their travel

to the Philippines and Dubai. The relationship "bec[a]me sour" in 2014, and in 2016 defendant bought her condominium because she no longer wanted to live with plaintiff. Defendant testified that plaintiff paid for the condominium with a check for $64,819.38. There was no promissory note or contract between the parties, and at the time plaintiff made no request for repayment. Asked about check number 727, defendant testified that she gave plaintiff the $50,000 toward the $64,819.38 he paid for the condominium, because she wanted him to stay away and believed his payment for the condominium had been an attempt to control her.[1]

¶ 9    In 2018, defendant began working at Landmark of Des Plaines (Landmark), another nursing facility. Despite having only one patient at Landmark in 2018, plaintiff "showed up" at defendant's office about six times that year. During these visits, which lasted two to four hours, he sat in her office. He sometimes took defendant's keys and left in her vehicle. He sometimes used the computer in her office and requested her login password, which she gave him. She sometimes left him sitting alone in her office, only to find him still there on her return. On occasion, he followed her to other parts of the nursing facility. On April 20, 2018, defendant told plaintiff not to visit her anymore. However, he continued to visit. Plaintiff did not call defendant in 2018.

¶ 10    In 2019, plaintiff paid a one-hour visit to defendant's office at Landmark, despite having no patients at the facility. That year, he "stopped by" to give her the title to her vehicle, which she had requested. Plaintiff called her beforehand to inform her that he would visit. In April 2021, plaintiff visited defendant in her office and stayed two hours. During the visits, plaintiff did not raise his voice or argue with defendant. He "s[at] there like a security guard, quiet," preventing her

---

[1] We note that during the trial on plaintiff's claims, plaintiff testified that the $50,000 check "was a payment for a loan that [defendant] had taken prior."

from focusing on her work. Plaintiff's conduct affected defendant's job performance by causing her stress and reducing her nightly sleep from eight or more hours to four hours. Defendant did not "see anyone for help" but reported the situation to the facility administrator.

¶ 11    On cross-examination, defendant testified she began working at Landmark in January 2018. She wrote check number 764 payable to plaintiff on April 20, 2018, the same day she told him to stay away. At the time of her testimony, she had texted him "fairly recently" to congratulate him on his marriage. She did not incur medical expenses as a result of his conduct.

¶ 12    Angelica Najara testified she had worked at Landmark as the facility's office manager from 2014 to 2020. In 2018, she observed plaintiff visit Landmark approximately twice a month for six months. During these visits, which lasted for more than two hours, plaintiff would sit in defendant's office. Defendant told Najara that she and plaintiff used to be in a relationship, that he was "trying to make her go back to him," and that his visits made her uncomfortable. Najara explained that defendant would sometimes leave plaintiff in her office and "find*** something else to do" elsewhere in the facility; she appeared to be uncomfortable and to be "avoiding him." According to Najara, defendant "looked so, so nervous all the time," and plaintiff's visits made defendant "nervous" and "sad."

¶ 13    On cross-examination, Najara testified she met defendant when she joined Landmark in early 2018. Najara admitted she borrowed "[m]aybe $5,000" from defendant without a written agreement and later repaid the loan. Presented with an image of a check for $6000 payable to defendant, Najara identified it as her repayment of the loan and testified she also gave defendant "a little bit more" in cash.

¶ 14    Asked whether she recalled borrowing additional sums, Najara denied recalling having done so. However, presented with an image of a check for $10,000, Najara confirmed her signature on the back and acknowledged having borrowed that additional sum from defendant and testified that she repaid it. Najara admitted to taking the first loan only two months after meeting defendant and to knowing that defendant loaned money to others.

¶ 15    Sana Mughal, a receptionist at Landmark from 2015 through 2019, testified that she had known defendant for nine years. After defendant began working at Landmark, they became close friends, and defendant told Mughal of her past relationship with plaintiff. She also told Mughal that plaintiff was calling her "nonstop" in 2018 and 2019, although at one point the two were not speaking. Plaintiff visited Landmark about 11 times in 2018. Mughal would see him sitting in defendant's office for over three hours while she worked. After the visits, defendant appeared "distressed," "[u]pset, sad," and "anxious." Defendant also "seemed distressed coming to work, a little paranoid." In 2019, plaintiff visited about six times, staying for over three hours per visit.

¶ 16    On cross-examination, Mughal testified that she resigned from Landmark in December 2019. She did not keep a log of plaintiff's visits to defendant's office or know the exact dates.

¶ 17    In defense of the countersuit, plaintiff, called by his counsel, testified that defendant never asked him to leave her office in 2018 or 2019 and that he would have left had she asked.

¶ 18    On June 22, 2022, the court entered an order (1) dismissing plaintiff's breach of contract claim, citing the statute of frauds (2) finding in favor of plaintiff on his deceptive practices claim and awarding him $64,819.38 plus $3000 in attorney fees and costs; and (3) entering judgment for plaintiff on both of defendant's counterclaims. As to the IIED claim, the court noted in its oral pronouncements that plaintiff's conduct in attempting to collect on the debt was "inappropriate"

but did not constitute IIED. The court noted "an absence of evidence of damage" and that "at no point" did defendant tell plaintiff " 'don't come here anymore' or 'don't contact me anymore.' " Regarding defendant's counterclaim for forgery, the court "d[id] not believe" her testimony that she wrote check number 764 for only $14,819.38.

¶ 19    Defendant appealed the judgments on her counterclaims. On December 13, 2022, this court entered an order on its own motion taking the case for consideration on the record and defendant's brief only. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 20    On appeal, defendant solely challenges the court's judgment on her counterclaim for IIED. She maintains the court erred in not finding plaintiff liable for IIED.

¶ 21    After a bench trial, we reverse a judgment only if it is against the manifest weight of the evidence. *Cadle Properties of Illinois, Inc. v. Fortune Investments, LLC*, 2021 IL App (1st) 200556, ¶ 23. A decision is not against the manifest weight of the evidence unless "an opposite conclusion is apparent or *** the findings appear to be unreasonable, arbitrary, or not based on the evidence." (Internal quotations omitted.) *Id.* (citing *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59). This court affords great deference to the trial court, which is better positioned to determine and weigh the witnesses' credibility, observe their demeanor, and resolve conflicts in their testimony. *Id.* (citing *Wade*, 2017 IL App (1st) 161765, ¶ 59).

¶ 22    Our supreme court has set forth the elements of an IIED claim as follows:

"First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct

must in fact cause severe emotional distress." *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 50 (citing *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988) (citing *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976))).

¶ 23    The standard for establishing the tort of IIED is high. *Benton v. Little League Baseball, Inc.*, 2020 IL App (1st) 190549, ¶ 64 (citing *Public Finance Corp.*, 66 Ill. 2d at 89-90). "Illinois case law makes clear that under no circumstances would mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities qualify as outrageous conduct." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 270 (2003). Rather, as explained in *Benton*:

> "[L]iability only attaches 'where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' and where the distress, when measured by its intensity and duration, is so severe that no reasonable man could be expected to endure it." *Benton*, 2020 IL App (1st) 190549, ¶ 64 (quoting Restatement (Second) of Torts § 46, comments *d*, *j* (1965)).

¶ 24    After reviewing the record, we find that the trial court's judgment finding plaintiff not liable for IIED was not against the manifest weight of the evidence where defendant failed to establish all three elements of an IIED claim. Specifically, defendant did not satisfy the first and third elements, *i.e.*, the evidence did not show that plaintiff's conduct was "truly extreme and outrageous" or caused severe emotional distress.

¶ 25    Regarding the first element of an IIED claim, "[t]he outrageousness of a [person]'s conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case." *McGrath*, 126 Ill. 2d at 86. Whether conduct is extreme and outrageous is determined under

an objective standard based on all the facts and circumstances of the particular case. *Chang Hyun Moon v. Kang Jun Liu*, 2015 IL App (1st) 143606, ¶ 25.

¶ 26    Relevant considerations include whether a person abused a position that gave him or her authority over the claimant or the power to affect the claimant's interests. *McGrath*, 126 Ill. 2d at 86-87. In addition, "[b]ehavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress." *Id.* at 90-91. On the other hand, the reasonableness of the actor's belief that his or her conduct serves a legitimate objective is also relevant, even though such belief is not "*carte blanche* to pursue that objective by outrageous means." *Id.* at 88. "Creditors, for example, though often able to exercise power over another, are given substantial latitude as to the pressure they can exert in order to collect payment to which they are legally entitled[,] *** even though the methods employed 'may result in some inconvenience, embarrassment or annoyance to the debtor.' " *Id.* at 88-89 (quoting *Public Finance Corp.*, 66 Ill. 2d at 92).

¶ 27    Here, in support of her claim that plaintiff's conduct was extreme and outrageous, defendant presented testimony that plaintiff persisted in contacting her after she terminated their relationship. Specifically, plaintiff made several hours-long visits to defendant's office at Landmark and other unwanted contacts. Defendant testified that in 2018 he visited her office six times and stayed for two to four hours; in 2019, he visited an unspecified number of times and stayed an hour, including once to deliver her car title after she asked him to do so and he called in advance; and in 2021 he visited an unspecified number of times, staying two hours. Najara testified that in 2018 plaintiff visited about 12 times (about twice a month for six months); Mughal testified

that plaintiff visited about 11 times in 2018 and six times in 2019. Further, defendant testified that plaintiff did not call her in 2018, whereas Mughal testified that she was informed by defendant that plaintiff called defendant "nonstop" in 2018 and 2019.

¶ 28    Even assuming plaintiff made the maximum number of visits and contacts that these witnesses collectively described, we cannot say that such conduct, however inappropriate from a professional or social standpoint, was "truly extreme and outrageous" so as to be actionable. *Schweihs*, 2016 IL 120041, ¶ 50. First, defendant presented no evidence that plaintiff held a position of authority over her at the relevant time such that abuse of his position could render his conduct tortious. *McGrath*, 126 Ill. 2d at 86-87 ("The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to a plaintiff's detriment."). Defendant denies that plaintiff was a creditor; he was not the medical director of Landmark and had at most a single patient there at the relevant time. Second, nothing in the record suggests that defendant was, or that plaintiff knew she was, "peculiarly susceptible to emotional distress." *Id.* at 90-91. Third, considering the reasonableness of any belief that plaintiff's conduct served a legitimate end, namely, to collect the money he believed was owed to him, such factor does not weigh in favor of defendant's position. See *id.* at 88-89. Although plaintiff's conduct may have been, as the trial court noted, "inappropriate," it did not rise to the level of truly extreme and outrageous, particularly where the record indicates that he paid for defendant's condominium and where courts have recognized the "substantial latitude" a creditor has in exerting pressure on a borrower in order to collect payment. *Id.*

¶ 29    We note that whether defendant ever instructed plaintiff not to visit her was disputed at trial, but she testified she instructed him to stop visiting her on April 20, 2018. Yet, nothing in the record suggests she ever took any other action to discourage or limit his conduct. Despite testifying that she informed the Landmark administrator of the situation, she did not present evidence of any intervention. Moreover, after that single instruction, she communicated directly with plaintiff by, at a minimum, requesting her vehicle title and sending him a congratulatory text. Furthermore, during his visits she honored his requests for the password to her work computer and allowed him to use the computer. Although she testified he sometimes took her keys and vehicle, there is no evidence that she forbade him from doing so or took any step to curtail him from doing so. Under these facts and circumstances, we cannot say that defendant's conduct was extreme and outrageous. *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶ 25.

¶ 30    Further, as the trial court found, defendant failed to present sufficient evidence of the third element, *i.e.*, that plaintiff's conduct resulted in "severe emotional distress." *Id.* ¶ 50. As noted, conduct is not extreme or outrageous, and therefore is not actionable, unless, measured by intensity and duration, it is so severe that no reasonable person could be expected to endure it. *Benton*, 2020 IL App (1st) 190549, ¶ 64; see, *e.g.*, *Prakash v. Parulekar*, 2020 IL App (1st) 191819, ¶ 51, *as modified on denial of reh'g* (if proved, allegations of a five-year campaign falsely attacking the claimant's professional reputation and causing loss of financial support for his research, deterioration of his mental and physical health, and his acquisition of medical help would establish "severe emotional distress").

¶ 31    Here, defendant neither consulted a physician or mental health practitioner nor incurred financial losses in coping with plaintiff's conduct. See *Prakash*, 2020 IL App (1st) 191819, ¶ 51.

The emotions and effects she experienced—stress, nervousness, discomfort, sadness, loss of sleep, and loss of focus at work—are, for purposes of an IIED claim, merely trivial injuries. See *Farrar v. Bracamondes*, 332 F. Supp. 2d 1126, 1131 (N.D. Ill. 2004) ("Stress, nervousness, anxiety, and sleeplessness that do not require any medical treatment are not severe emotional distress."); *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶ 25 (citing *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 38 (1997) ("[T]he infliction of such emotional distress as fright, horror, grief, shame, humiliation and worry is not sufficient to give rise to a cause of action.")).

¶ 32    Nevertheless, defendant notes in her brief that certain evidence of plaintiff's conduct and the witnesses' descriptions of its effects on her are unrefuted. Be that as it may, as we have explained, viewed under an objective lens and in light of all relevant facts and circumstances, plaintiff's conduct was not so outrageous or extreme as to go beyond all possible bounds of decency, atrocious, or utterly intolerable. *Benton*, 2020 IL App (1st) 190549, ¶ 64; *Franciscan Communities, Inc. v. Hamer*, 2012 IL App (2d) 110431, ¶ 47 ("the trier of fact is always free to disbelieve any witness"). Nor is defendant's distress so severe that no reasonable person could be expected to endure it. *Benton*, 2020 IL App (1st) 190549, ¶ 64.

¶ 33    In sum, we find that the trial court's judgment in plaintiff's favor and against defendant on her counterclaim for IIED is not against the manifest weight of the evidence. *Samour, Inc. v. The Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 542 (2007). Stated differently, the court's finding was not unreasonable, arbitrary, or not based on the evidence.

¶ 34    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 35    Affirmed.