Beverly **WHITEHEAD**, Plaintiff,

v.

**AM INTERNATIONAL, INC.**, Defendant.

No. 93 C 1037.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 9, 1994.

---

Mary Jude Adams, Sloan and Adams, Chicago, IL, for plaintiff.

Stephanie Mills Graham, Susan M. Benton–Powers, Faith Holloway Spencer, Monica O. Haenselman, Sonnenschein, Nath & Rosenthal, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is the motion of defendant AM International ("AMI") to dismiss counts II, III, and IV of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion is granted.

### FACTS [1]

On July 15, 1985, AMI hired plaintiff Beverly Whitehead ("Whitehead") as an execu-

---

1. The following facts are drawn from the allegations contained in Beverly Whitehead's com-

tive secretary. She was assigned to the Vice President of Corporate Relations, Marion Durk ("Durk"). Whitehead's responsibilities included general clerical duties, answering telephone calls, typing, editing, organizing, and disseminating product information to AMI shareholders and potential investors.

During the course of her employment with AMI, Whitehead's responsibilities expanded in its scope to include planning of various events, assisting the publication of an in-house newsletter, and coordinating the compilation and monitoring of product information. She, however, received neither "an appropriate job title reflective of [her new] responsibilities, nor ... recognition of her accomplishment by way of [a pay raise]." (Pl.'s Compl. ¶ 8.) Furthermore, AMI never "allowed [Whitehead] to exercise her full potential."[2] *Id.*

Whitehead performed her duties "satisfactorily," and her job performance evaluations reflect "superior performance." *Id.* ¶ 7. Despite her "superior performance" record, Durk placed Whitehead on probation on October 9, 1991, for a period of ninety days. According to Whitehead, her relationship with Durk was far from being cordial or professional. She alleges that Durk singled her out from other employees and repeatedly reprimanded her without justification and even tossed papers directly at her in front of her co-employees, "[i]ntercept[ed White-head's] planned award for 'Employee of the Year,'" *id.* ¶ 21(b), denied her requests for various benefits such as tuition reimbursement, medical leave, and vacation days, and disciplined her "to the exclusion of others who had engaged in similar employment practices...." *Id.* ¶ 21(f).

On October 11, 1991, Whitehead complained of harassment and discriminatory treatment to Merle H. Banta ("Banta"), who was the Chairman of the Board of Directors, the Chief Executive Officer of AMI, and the direct supervisor of Durk. Whitehead relat-ed to Banta that Durk placed her on probation unjustifiably and denied tuition reimbursement while granting identical requests of other employees. Banta responded that he would investigate the matter. Banta, however, never responded to Whitehead's complaints.

On November 21, 1991, Whitehead expressed her grievances to Morton Rible ("Rible"), the Senior Vice President of Human Resources. She complained to Rible that Durk had eliminated some of Whitehead's responsibilities and denied her requests for vacation days for no reason. Whitehead asked Rible to investigate the matter and to intervene on behalf of her. Rible promised, as Banta did, to investigate and to remedy the alleged problems. Rible, likewise, never responded to Whitehead's requests for remediation.

On November 25, 1991, Whitehead met with Marion Gruber ("Gruber"), the Director of Human Resources, to inform him of the "continuing difficulties [she was having] with Marion Durk."[3] *Id.* ¶ 17. Gruber offered to arrange a meeting with Durk and Whitehead. Gruber, however, never arranged the meeting. In fact, shortly thereafter, on December 2, 1991, AMI terminated Whitehead's employment. AMI informed Whitehead that the reasons for her termination were her tardiness and insubordination.

On May 7, 1992, Whitehead filed a charge of discrimination with the State of Illinois Department of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC"). On November 23, 1992, the EEOC sent a notice of right to sue to Whitehead. Subsequently, on February 18, 1993, Whitehead filed a four-count complaint against AMI. The complaint represents that Whitehead brings the action against AMI pursuant to 28 U.S.C. § 2201, the Civil Rights Act of 1871, 42 U.S.C.

---

plaint and the charge of discrimination filed with both the State of Illinois Department of Human Rights and the United States Equal Employment Opportunity Commission.

**2.** Whitehead does not explain what other duties and functions she was capable of performing had AMI given her the opportunity to reach maximum potential. Further, she does not describe the nature of her potential in the complaint.

**3.** The complaint does not detail the nature of the difficulties Whitehead related to Gruber.

§§ 1981, 1983,[4] and the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000e, *et seq.* In addition to the discrimination claims, Whitehead asserts a state tort claim based on the theory of intentional infliction of emotional distress.

In the instant motion, AMI contends that counts II and III, the retaliatory discharge and sexual harassment claims, must be dismissed for failure to exhaust administrative remedies. AMI further contends that count IV, the tort claim, must be dismissed because it is barred by the exclusive remedy provision of the Illinois Workers' Compensation Act, 820 ILCS 305/1, *et seq.,* and it fails to state a cause of action for intentional infliction of emotional distress.

### *DISCUSSION*

■ On a motion to dismiss, all well-pleaded factual allegations are presumed to be true. *Land v. Chicago Truck Drivers,* 25 F.3d 509, 511 (7th Cir.1994). The court must view those allegations in the light most favorable to the plaintiff, *Gould v. Artisoft, Inc.,* 1 F.3d 544, 546 (7th Cir.1993), and accepts all reasonable inferences to be drawn from those allegations as true. *Meriwether v. Faulkner,* 821 F.2d 408, 410 (7th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). The court is not, however, constrained by the legal characterizations placed on those allegations by plaintiff. *Republic Steel Corp. v. Penn. Eng'g Corp.,* 785 F.2d 174, 183 (7th Cir.1986).

■ Additionally, the court must construe the pleadings liberally, and mere vagueness or lack of detail alone will not constitute sufficient grounds to dismiss a complaint. *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985). The complaint need not specify the correct legal theory nor point to the right statute to survive a Rule 12(b) motion to dismiss. *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1134–35 (7th Cir.1992). The complaint must, however, state either direct or inferential allegations to establish the necessary elements for recovery under the chosen legal theory. *Glatt v. Chicago Park Dist.,* 847 F.Supp. 101, 103 (N.D.Ill.1994).

■ Whitehead alleges in counts II and III that AMI sexually harassed her and retaliated against her in violation of Title VII. AMI moves to dismiss these counts on the grounds that these allegations of civil rights violations are outside the scope of Whitehead's EEOC charge. In support, AMI attached the EEOC charge completed by Whitehead as an exhibit to its motion to dismiss.[5]

■ A condition precedent to filing a Title VII action in federal court is that the plaintiff must have first asserted the discrimination claims in the EEOC charge. *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1110 (7th Cir.1992). A Title VII plaintiff cannot bring claims in a civil action that are beyond the scope of the plaintiff's EEOC charge. *Cheek v. Western and S. Life Ins. Co.,* 31 F.3d 497, 503 (7th Cir.1994); *Taylor v. Western and S. Life Ins. Co.,* 966 F.2d 1188, 1194 (7th Cir. 1992). Accordingly, an aggrieved employee may not complain of certain acts of discrimination to the EEOC and then file an action claiming different acts of discrimination.

---

4. Any claim made pursuant to 42 U.S.C. § 1983 is stricken. State action is an essential jurisdictional predicate under § 1983, and lack thereof warrants dismissal of the claim. *Sampson v. Village Discount Outlet, Inc.,* 832 F.Supp. 1163, 1167 (N.D.Ill.1993). Generally, the protections of § 1983 do not extend to private conduct violating individual rights no matter how abhorrent the conduct may be. *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988). In this case, AMI is a private company and Durk is a private individual.

5. A Rule 12(b)(6) motion typically focuses on the four-corners of the complaint to determine whether the complaint states a cause of action. To determine the proper scope of Whitehead's Title VII complaint, however, the court must consider the accusations made in the EEOC charge. *See, e.g., Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 929 (11th Cir.1983) (the permissible scope of the civil complaint is defined by the EEOC charge and investigation). Thus, the court will consider the exhibits attached to AMI's motion to dismiss in resolving the issues raised by AMI, but the court will not treat the motion as a motion for summary judgment. *See Venture Assocs. v. Zenith Data Sys.,* 987 F.2d 429, 431 (7th Cir.1993); *see also* Fed.R.Civ.P. 10(c).

*Johnson v. Indopco,* 834 F.Supp. 1039, 1043 (N.D.Ill.1993).

 The function of this condition precedent is to preserve the principle of primary jurisdiction of the EEOC and to provide the EEOC and the employer an opportunity to settle the discrimination accusations without resort to litigation. *Rush,* 966 F.2d at 1110. To effectuate the remedial purpose of Title VII, however, the court must construe the EEOC charge with "utmost liberality" in identifying the permissible claims. *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 864 (7th Cir.1985); *Otterbacher v. Northwestern Univ.,* 838 F.Supp. 1256, 1260 (N.D.Ill. 1993).

 A claim is considered to be within the scope of the EEOC charge if it is "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Jenkins v. Blue Cross Mutual Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir.) (*en banc*), *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). Further, claims of discrimination communicated during the course of the investigation and conciliation are also proper claims to be made in a Title VII complaint. *O'Rourke v. Continental Cas. Co.,* 983 F.2d 94, 97 (7th Cir.1993).

 In the instant action, the liberal application of the *Jenkins* standard cannot bring the claims of sexual harassment and retaliatory discharge within the scope of the EEOC charge.[6] Whitehead made the following accusations of disparate treatment in her EEOC charge:

> I. On December 2, 1991, I was discharged from my position as administrative assistant. On November 18, 1991, I was denied a requested vacation. On November 15, 1991, I was harassed. I was hired on July 15, 1985.
>
> II. According to Marion G. Durk (white), Vice President of Corporate Relations, I was discharged due to tardiness; violation of lunch hour rules; and failure to follow proper procedures regarding word processing system, acquisition of meeting

space, opening of department mail and utilization of vacation time. Durk said I was denied approval of my vacation request because no time off requests for that time period, were being approved.

> III. I believe I have been discriminated against because of my race, black, in that:
>
> A. On a number of occasions, including November 15, 1991, I was harassed by Durk, who verbally reprimanded me in the open office, in the presence of my coworkers. When Durk found it necessary to reprimand my co-worker, Marcy Calkins (white) she always did so behind closed doors.
>
> B. Durk behaved in an extremely unprofessional manner, when she intentionally failed to interact with me regarding a press release; and I was denied the opportunity to fulfill one of the responsibilities of my job. When co-worker, Lee Drew Hartin (white), was given an assignment relating to a press conference he was unable to follow through on the assignment, not because of Durk's failure to cooperate, but rather, because Hartin arrived two hours late. He was not disciplined because of this irresponsibility.
>
> C. I was an excellent worker and was generally evaluated as such.
>
> D. My tardiness history was no worse than Hartin's but he was not discharged as I was.
>
> E. When Calkins was guilty of failing to follow proper procedures, such as not meeting important publication deadlines, she was not treated as I was. Calkins once failed to secure a photographer for an important event, but was not discharged because of it. When there were heated disagreements between Calkins and Durk, regarding various work related issues, Durk never threatened my co-worker with discharge.
>
> F. While I was penalized for taking two unauthorized vacation days, when Durk refused to approve the time I needed for

---

**6.** This holding is independent of any possible ruling the court may render during the trial as to the admissibility and relevance of evidence that may demonstrate that AMI sexually harassed and retaliated against Whitehead because of her gender or race.

medi[cal and] court appointments, Hartin's request for time off was not denied.

(Def.'s Mot. to Dismiss Ex. A.) Furthermore, the section which asks the cause of discrimination, only the box marked "race" was checked and the boxes marked "sex" and "retaliation" were left blank. While these boxes do not control the scope of a subsequent Title VII complaint, *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 368 (7th Cir.1993), they are nonetheless helpful in determining the gravamen of the employee's allegations in the body of the EEOC charge.

An examination of the allegations Whitehead included in the EEOC charge reflects that the cause of the disparate treatment and the resulting discharge were based on her race. Under paragraph III, she states that "I believe I have been discriminated against because of my race, black...." Furthermore, in describing the disparate treatment Whitehead compares the treatment she received from Durk to other co-employees who are *white*. There is no suggestion from Whitehead's allegations that Durk treated her in an oppressive manner because of her gender or that she sexually harassed Whitehead.

■ Whitehead counters that her claim of sexual harassment was properly raised in the EEOC charge because she used the word "harassed." The court disagrees. The flaw in this contention is that Whitehead equates "harassment," as the term is commonly used with the term "sexual harassment" as it is used for purposes of Title VII. Title VII prohibits employers from discriminating against any individual based on gender as well as race. 42 U.S.C. § 2000e–2(a)(1). "Sexual harassment" is recognized as a form of discrimination based on gender. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986).

■ A claim of sexual harassment may be established by alleging that the employee's economic privileges were linked to sexual misconduct, commonly referred to as the *quid pro quo* harassment, or that the sexual misconduct has created a hostile or abusive work environment. *Saxton v. American Tel.*

*& Tel. Co.*, 785 F.Supp. 760, 764 (N.D.Ill. 1992). In this action, Whitehead accuses AMI of "[i]ntentionally creating a hostile work environment." (Pl.'s Compl. ¶ 21(h).) Thus, the court will review the legal standard applicable to a claim of sexual harassment based on a hostile working environment.

■ The Seventh Circuit has established a five-part test to evaluate whether a plaintiff may maintain a sexual harassment claim based on hostile work environment. *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). The five factors are as follows:

(1) The employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of respondeat superior liability.

*Id.* (quoting *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1237 (7th Cir.1989)). These factors demonstrate that Title VII prohibits even the subtle form of sex discrimination by prohibiting sexual harassment where nonsolicited sexual advances are the problematic condition of a working environment.

In this case, sexual advances are not involved. The allegations contained in the complaint and the EEOC charge establish only that the nature of "harassment" which Durk meted out amounts to lack of civility and disparate treatment. The issues of sexual advances and gender discrimination do not exist in this case as presented in the EEOC charge.

Additionally, there are no allegations in the EEOC charge which may give rise to the slightest hint of a retaliatory discharge claim as alleged in count II. The Title VII com-

plaint includes detailed facts regarding various meetings Whitehead had with certain top-ranking corporate officers of AMI, but those allegations, even in general terms, are absent from the EEOC complaint. Moreover, there is no allegation that retaliatory discharge claim or sexual harassment claims were ever communicated to AMI during the conciliation period. Thus, Whitehead failed to satisfy the condition precedent to bring claims of retaliatory discharge and sexual harassment in this lawsuit. Accordingly, counts II and III are dismissed.

■ AMI next argues that count IV must also be dismissed. In count IV, Whitehead alleges that AMI intentionally inflicted emotional distress because AMI "intentionally discriminated against [Whitehead] in violation of the Civil Rights Act of 1871 and the Illinois Human Rights law causing pain, suffering and humiliation." (Pl.'s Compl. ¶ 27.) Because Whitehead was an employee of AMI at the time of the alleged infliction of emotional distress, the first step of the analysis is analyzing whether the tort claim against AMI is barred under the exclusive remedy provision of the Illinois Workers' Compensation Act ("Act"), 820 ILCS 305/5(a).

■ The court finds that Whitehead's pendent state claim against AMI is not barred by the Act. The fundamental purpose of the Act is to provide financial protection to Illinois workers in the event they sustain accidental injuries during the course of their employment. *Meerbrey v. Marshall Fields & Co.*, 139 Ill.2d 455, 151 Ill.Dec. 560, 563, 564 N.E.2d 1222, 1225 (1990). Under the statutory scheme of the Act, injured employees are entitled to recover monetary compensation for their injuries without establishing negligence on the part of their employers. *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 562, 384 N.E.2d 353, 356 (1978). In exchange, the injured employees relinquish their rights to maintain common law actions against their employers and are limited to a fixed amount of compensation. *Id.* As a result, employers escape the possibility of having to pay large jury awards. *Id.*

■ The exclusive remedy provision was designed to maintain the *quid pro quo* scheme. The provision states:

> No common law or statutory right to recover damages from the employer ... for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act....

820 ILCS 305/5(a). This rule, however, is not an absolute rule barring any and all common law causes of action. *Meerbrey,* 151 Ill.Dec. at 564, 564 N.E.2d at 1226. There are four exceptions to the exclusive remedy provision: (1) where the injury to the employee was not accidental; (2) where the injury did not arise from the employee's employment; (3) where the injury was not sustained by the employee during the course of employment; or (4) where the injury is not compensable under the Act. *Id.* In this case, Whitehead argues that she is entitled to maintain a common law cause of action under the first exception.

■ It is well established in Illinois that the Act does not protect an employer from common law liability where the employer intentionally causes harm to the employee. *Meerbrey,* 151 Ill.Dec. at 564, 564 N.E.2d at 1226; *Collier v. Wagner Castings Co.,* 81 Ill.2d 229, 41 Ill.Dec. 776, 780, 408 N.E.2d 198, 202 (1980); *Jablonski v. Multack,* 63 Ill.App.3d 908, 20 Ill.Dec. 715, 719, 380 N.E.2d 924, 928 (1978). A co-employee's intentional tort, however, may not be attributed to the employer by operation of the doctrine of *respondeat superior. Jaskowski v. Rodman & Renshaw, Inc.,* 813 F.Supp. 1359, 1362 (N.D.Ill.1993). To determine whether an injury causing incident is "accidental," for purposes of the exclusive remedy provision, the incident must be viewed from the perspective of the person seeking protection under the Act. 2A ARTHUR LARSON, LAW OF WORKMEN'S COMPENSATION, § 68.12 at 13–18. From the perspective of the co-employee, his intentional wrongdoing is not accidental because such act is committed knowingly, but from the perspective of the employer, the resulting injury is accidental within the

meaning of the Act because the employer did not foresee or expect the injury. *Id.*

■ Under two circumstances, however, a co-employee's intentional tort is attributable to the employer: (1) where the employer specifically commands or expressly authorizes the co-employee to commit the intentional tort, and (2) where the co-employee acts as the alter ego of the employer. *Meerbrey,* 151 Ill.Dec. at 564, 564 N.E.2d at 1226; *Fitzgerald v. Pratt,* 223 Ill.App.3d 785, 166 Ill.Dec. 200, 204, 585 N.E.2d 1222, 1226 (1992), *appeal denied,* 144 Ill.2d 632, 169 Ill.Dec. 141, 591 N.E.2d 21 (1992); *Johnson v. Federal Reserve Bank of Chicago,* 199 Ill.App.3d 427, 145 Ill.Dec. 558, 562, 557 N.E.2d 328, 332 (1990), *appeal denied,* 133 Ill.2d 558, 149 Ill.Dec. 323, 561 N.E.2d 693 (1990). The Supreme Court of Illinois in *Meerbrey* did not identify which employees of an employing entity may act as an "alter ego" of the employer. However, the Illinois Appellate Court in *Johnson* equated managers of the defendant bank as alter egos of the bank. *Johnson,* 145 Ill.Dec. at 562, 557 N.E.2d at 332. Unfortunately, the *Johnson* court did not explain why bank "managers" are "alter egos" of the bank. The court nonetheless concludes that under Illinois law, where the employer is a fictitious person, i.e., corporate entity, and its authorities and powers are necessarily delegated to supervisors to conduct the corporate business, the supervisors act as alter egos of the corporate entity. *See Buddingh v. South Chicago Cable, Inc.,* 830 F.Supp. 437, 443 (N.D.Ill.1993).

Under the liberal construction rule, Whitehead has not alleged that AMI expressly commanded or authorized Durk to harass Whitehead, but she has alleged enough facts to establish that Durk was acting as an alter ego of AMI. According to the complaint, Durk possessed supervisory and managerial authorities over Whitehead. Further, Durk had the discretionary power to grant tuition reimbursements, vacation days, sick leaves, and to discharge employees. Under these circumstances, Durk must be considered an alter ego of AMI; thus, the Act will not operate as a bar to count IV.

■ The second step of the analysis is resolving whether Whitehead has alleged enough facts under the notice pleading standard to state a cause of action for intentional infliction of emotional distress. To state a cause of action for intentional infliction of emotional distress, the complaint must satisfy the following elements:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that this conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress.

*Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 702 (7th Cir.1993) (quoting *McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (1988)) (emphasis in the original). The necessary elements such as "extreme and outrageous" conduct and "severe" emotional distress are difficult to define and apply. *See Pelech v. Klaff–Joss, LP,* 828 F.Supp. 525, 534 (N.D.Ill.1993) ("it is no easy task for courts to determine when to describe conduct as 'extreme and outrageous.' ").

■ The Illinois courts have consistently portrayed the tort of intentional infliction of emotional distress as an intentional tort requiring a heightened level of egregiousness in comparison to other intentional torts such as assault and battery. In *Public Finance Corp. v. Davis,* 66 Ill.2d 85, 4 Ill. Dec. 652, 360 N.E.2d 765 (1977), the Supreme Court of Illinois stated that:

> The liability clearly does not extend to mere insults, indignities, threats, annoyance, petty oppression or trivialities. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency...."

*Id.* 4 Ill.Dec. at 654, 360 N.E.2d at 767 (quoting RESTATEMENT (SECOND) OF TORTS § 46 Cmt. d (1965)). Further, while humiliation and worry resulting from employment discrimination constitute emotional distress, the *Public Finance* Court held that those types of distress are not actionable. *Id.* "The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Id.;* *see also Miller v. Equitable Life Assurance Soc'y,* 181 Ill.App.3d 954, 130 Ill.Dec. 558, 560, 537 N.E.2d 887, 889 (Ill.App.Ct.1989).

■ These Illinois holdings serve as proper guidance for the court to determine whether certain conduct is actionable under the theory of intentional infliction of emotional distress. Applying the standard to the case at bar, the court concludes that Whitehead's allegations of disparate treatment, albeit unpleasant and humiliating, are not enough to constitute "extreme and outrageous" for purposes of count IV. Additionally, count IV lacks the second required element that Durk either specifically intended to cause or that she knew her oppressive behavior had high probability of causing emotional distress.

Lastly, Whitehead failed to allege actionable emotional distress. For the court to hold otherwise, under the facts of this case, would mean that any employee with a Title VII claim would also be entitled, without more, to bring an action for intentional infliction of emotional distress. Such a sweeping rule would undermine Illinois law on the subject. Accordingly, count IV is dismissed.

### CONCLUSION

For the foregoing reasons, the motion of AMI to dismiss counts II, III, and IV is granted.

IT IS SO ORDERED.