Meredith **TURNER**, Plaintiff,

v.

Kim **McQUARTER**, et al., Defendants.

No. 99 C 240.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 13, 1999.

Bruce Scott Kreisman, Donald Wayne Anderson, Cindy Gale Fluxgold, Louis Samuel Goldstein, Goldstein & Fluxgold, Ltd., James G. McConnell, Susan E. Loggans & Associates, Chicago, IL, for Plaintiff.

Thomas M. Paris, Maura Ann Fennelly, Illinois Attorney General's Office, Chicago, IL, for Defendants.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Meredith Turner (Turner) instituted this civil action for damages against her former basketball coach, Kim McQuarter (McQuarter), and against Chicago State University (CSU) and its board of trustees. Turner alleges she was coerced into pursuing a sexual relationship with coach McQuarter in violation of her rights under state and federal law. CSU and the board of trustees (collectively the "school defendants") now move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that defendants had no actual notice of the alleged conduct as required for liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and that plaintiff's state law claims are barred by the doctrine of sovereign immunity. Defendant Kim McQuarter moves to dismiss pursuant to Rule 12(b)(6) on the grounds that the claims against her are untimely and that no civil rights violation has been alleged.

### Facts

For purposes of a motion to dismiss, we accept as true all of plaintiff's well-pleaded facts and draw all reasonable inferences therefrom in favor of plaintiff. *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir. 1991). In light of that standard, the facts are as follows:

Turner was a student at Chicago State University in Chicago, Illinois, from February 1996 until she graduated on January 18, 1997. CSU is a state-supported public university and a recipient of federal funds. In February and March 1996, Turner was a member of the women's basketball team under head coach Kim McQuarter. In February, McQuarter initiated a sexual relationship with Turner which lasted "throughout" her enrollment at CSU. Plaintiff alleges that McQuarter's unwelcome sexual advances created an intimidating, offensive and hostile environment and substantially interfered with Turner's educational and athletic experiences. McQuarter allegedly had the authority to terminate an academic scholarship she had procured for Turner after Turner lost her athletic eligibility in the spring of 1996. Plaintiff maintains that she would not have entered into or continued a sexual relationship with McQuarter but for her fear that refusal would have resulted in revocation of her athletic and academic scholarships, adverse consequences with respect

to playing opportunities and status on the basketball team, imposition of arbitrary and oppressive practice and conditioning requirements, and the loss of her "ability to graduate from CSU" (cplt., ¶ 13). The complaint does not indicate when the relationship ended.

Turner suggests that the CSU athletic director and board of trustees knew of the inappropriate relationship because official CSU records indicated that McQuarter's home address was identical to Turner's home address. No other notice to school officials is alleged in the complaint other than the fact that McQuarter was herself the head of an educational program which received federal financial assistance.

Plaintiff filed her complaint in federal court on January 15, 1999, almost three years after she entered into the relationship with her coach. In count I she alleges a violation of the Equal Protection Clause of the Fourteenth Amendment; count II charges that the school defendants violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a); count III alleges that all defendants acted in violation of the equal protection clause of the Illinois Constitution, Article I, Section 18; and count IV seeks compensatory damages from all defendants for McQuarter's intentional infliction of emotional distress. As plaintiff now resides in Ohio, she invokes our jurisdiction under both 28 U.S.C. § 1331 and § 1332. We have before us the school defendants' amended motion to dismiss filed April 1, 1999, and defendant McQuarter's motion to dismiss filed May 19, 1999.

### Discussion

A motion to dismiss may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### A. *The School Defendants*

■ Title IX prohibits sex-based discrimination by educational programs and activities that receive federal financial assistance. 20 U.S.C. § 1681(a). Discrimination "on the basis of sex" has been judicially interpreted to include sexual harassment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (supervisor/subordinate); *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (teacher/student); *Davis v. Monroe County Bd. of Education,* 526 U.S. 629, 119 S.Ct. 1661, 1674, 143 L.Ed.2d 839 (1999) (student/student). Title IX's express statutory means of enforcement is administrative, directing federal agencies to enforce the nondiscrimination mandate through all authorized means, including termination of funding. 20 U.S.C. § 1682; *see Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 288, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

This enforcement scheme is premised on actual notice to officials of the federal funds recipient. *Gebser,* 524 U.S. at 288, 118 S.Ct. 1989. A federal agency may not initiate enforcement proceedings against a recipient until it "has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682. According to the Court, an appropriate person is "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser,* 524 U.S. at 290, 118 S.Ct. 1989. "A central purpose of requiring actual notice of the violation 'to the appropriate person' and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures." *Id.* at 289, 118 S.Ct. 1989.

■ Besides agency action, Title IX is also enforceable through an implied pri-

vate right of action for damages. *Id.* at 283–284, 118 S.Ct. 1989; *Cannon v. University of Chicago,* 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). But unlike Title VII, which was designed to compensate victims of employment discrimination, Title IX was enacted primarily to prevent discrimination in educational programs. *Gebser,* 524 U.S. at 292, 118 S.Ct. 1989. Thus, *Gebser* made clear that funding recipients will not be liable for sexual harassment under Title IX unless an appropriate official received actual notice and was deliberately indifferent to the teacher's misconduct.

> [I]t would frustrate the purposes of Title IX to permit a damages remedy against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.,* without actual notice to a school district official.

*Id.*

■ Drawing all reasonable inferences from the complaint, there are two possibilities for actual notice here: notice to the athletic director or board of trustees via the school records,[1] or notice to McQuarter herself as an official in charge of a recipient program. We think the former does not meet the *Gebser* requirement of providing actual notice of the "misconduct." It is hard to imagine under what circumstances the identical addresses would have come to the attention of school officials. However, even if the athletic director recognized the similarity, the addresses do not directly reveal any impropriety. Indeed, there are perfectly innocuous rea-

sons why a student would share the address of her coach: the building may have several apartments, the coach may have agreed to forward mail during a move, the coach may have rented a room to the student, she may have provided space to a needy student athlete, or the two could be related, among other possibilities. In any case, the complaint does not meet the actual notice requirement with respect to the school officials. In *Gebser,* the Supreme Court denied relief to a minor who had engaged in sexual intercourse with a teacher because the only notice to the defendant school district had been several parent complaints to the high school principal regarding the teacher's sexually suggestive classroom comments. *Id.* at 291, 118 S.Ct. 1989. The parent communications constitute significantly more notice than identical addresses in official records.

■ Plaintiff argues, in the alternative, that McQuarter herself represents an "authoritative CSU official."

> [U]ndoubtedly she had authority to remedy sexual harassment taking place in the basketball program if, *e.g.,* such misconduct was committed by her assistant coaches, graduate assistants, trainers, managers or players. In this respect she is akin to a high-ranking university official, such as the CSU president, rather than the high school teacher in *Gebser.*

(plf.'s mem. in opp., at 4). Plaintiff is unable to point to any case law in support of this position[2] and defendants fail to address the question in their reply.

We think the best interpretation of the statute and the Court's recent case law

---

**1.** In her brief, at 3, plaintiff calls our attention to paragraphs 22 and 25 of the complaint, which allege that the school defendants "knew" and had "actual knowledge" of the misconduct. Even under the liberal federal pleading rules, this is insufficient to allege notice or knowledge. Plaintiff must at least provide facts from which it is reasonable to infer the possibility that defendants knew of the sexual relationship.

**2.** Plaintiff cites *Kracunas v. Iona College,* 119 F.3d 80 (2d Cir.1997), which held that "in a

Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII." *Id.* at 86, *citing Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir.1995). But the analogous "supervisor liability" under Title XII rests on principles of *respondeat superior, see Faragher v. City of Boca Raton,* 524 U.S. 775, 780, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998),

would find this theory of notice insufficient to hold the school defendants liable for McQuarter's conduct. As discussed above, the Court has indicated that the goals of Title IX would be undermined by imputing the harasser's knowledge to the funding recipient. In *Davis, supra,* a case examining school liability for student-on-student harassment, the Court indicated that "[i]f a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment." 526 U.S. 629, 119 S.Ct. 1661, 1672, 143 L.Ed.2d 839 (1999). In *Gebser,* at 291, 118 S.Ct. 1989, the majority rejected Justice Steven's argument in dissent that the district should be liable because the harassing teacher had actual notice of his own conduct and, because of the authority delegated by the school district, was in control of an activity subsidized with federal monies. *See Gebser,* 524 U.S. at 298–99 & n. 8, 118 S.Ct. 1989 (Stevens, J. dissenting). We see no reason to distinguish the women's basketball program here from the book group in *Gebser.*

▪ As to the state law claims against the school defendants, state rules of sovereign immunity govern state law causes of action in federal court. *Magdziak v. Byrd,* 96 F.3d 1045, 1048 (7th Cir.1996). Under Illinois law, suits against state agencies, and state employees, acting within their scope of employment, are actionable only

which the Court has now expressly repudiated for liability under Title IX. *Kracunas'* holding that constructive notice is sufficient, 119 F.3d at 88, has also been abrogated by *Gebser* and *Davis.*

Plaintiff also cites to *Klemencic v. Ohio State University,* 10 F.Supp.2d 911 (S.D.Ohio 1998), decided after *Gebser.* Klemencic, however, seems to undermine plaintiff's contention that notice to the harasser is sufficient. The court found that "no one at OSU who had authority to institute corrective measures had actual notice of [the assistant coach]'s alleged harassment until Klemencic informed her head coach and the Athletic Director. ...." *Id.* at 918. When the athletic director was informed, he conducted an investigation

in the Illinois Court of Claims. *Benning v. Bd. of Regents of Regency Universities,* 928 F.2d 775, 779–780 (7th Cir.1991); 745 ILCS 5/1 (1972). The Illinois Court of Claims Act invests that court with "exclusive jurisdiction to hear and determine ... [a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit...." 705 ILCS 50⅚(d) (1996). Accordingly, plaintiff's claims under the Illinois constitution and the Illinois common law of intentional infliction of emotional distress must proceed in the Court of Claims.

### B. *Claims against McQuarter*

▪ Count I of the complaint charges that McQuarter's conduct under color of state law violated Turner's right to equal protection guaranteed under the Fourteenth Amendment and enforceable under 42 U.S.C. § 1983. As an initial matter, we note that the Eleventh Amendment bars a damages action against McQuarter in her official capacity. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that Congress did not manifest an intention to override the states' sovereign immunity when it enacted § 1983). *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), however, confirmed that a state officer may be sued in her personal capacity when the conduct in question was part of her official duties.[3] *See also Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52

and "no further harassment in the form of sexual advances or likewise occurred thereafter." *Id.* That is precisely the chronology anticipated by the statutory scheme. Before liability is imposed, the institution is given an opportunity to correct the discrimination. Here, if the athletic director had been notified, we would be reviewing his or her corrective actions or the absence thereof for deliberate indifference.

**3.** Although the complaint indicates that count I is against McQuarter in her official capacity (¶ 15), it earlier avers that McQuarter is sued "both individually and in her official capacity as head women's basketball coach" (¶ 8). We will assume that count I is against McQuarter in her personal capacity.

L.Ed. 714 (1908). "[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Hafer*, 502 U.S. at 25, 112 S.Ct. 358, *quoting Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

 Defendant McQuarter argues that we need not reach the merits of Turner's claim, however, because the two-year statute of limitations has run. *See Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir.1992) (Section 1983 actions are governed by the personal injury statute of limitations in the state where the alleged injury occurs); 735 ILCS 5/13–202 (two year statute of limitations for personal injury claims). We agree.

Plaintiff filed her complaint on January 15, 1999. Therefore, her claims against McQuarter must not have accrued prior to January 15, 1997. She seeks to take advantage of the "continuing wrong" principle which provides, in some circumstances, that the statute of limitations does not begin to run "until the wrong is over and done with." *See Taylor v. Meirick*, 712 F.2d 1112 (7th Cir.1983). Plaintiff argues that the wrongful conduct at issue here continued through January 18, 1997, at which point she was no longer under McQuarter's "authority and control." Plaintiff maintains that she did not end the relationship sooner out of fear that McQuarter could prevent her graduation

from CSU.[4] McQuarter argues that Turner's fear about graduating was unreasonable because she had no authority to block Turner's commencement. Maybe so, but that is not the dispositive question. Rather, the question is when Turner was alerted to the possibility that her civil rights were being violated.

 While state law establishes the statute of limitations and any applicable tolling provisions, federal law determines the accrual of her claims. *Wilson*, 956 F.2d at 740. Generally, a cause of action accrues when a plaintiff knows or has reason to know of the injury giving rise to the cause of action. *Id.* "Civil rights claims, therefore, accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." *Id.; Doe v. Board of Educ. of Hononegah Comm. High School Dist. No. 207*, 833 F.Supp. 1366, (N.D.Ill.1993). The complaint indicates that Turner feared reprisals as early as spring 1996, when she worried that McQuarter would terminate her athletic scholarship (cplt., ¶¶ 11, 13). Accordingly, the statutory period for any civil rights deprivation resulting from McQuarter's coercion would have expired by the spring of 1998. Turner's claims under § 1983 must be dismissed as untimely.

 Lastly, we must decide whether the claim against McQuarter for intentional infliction of emotional distress accrued prior to January 15, 1997.[5] We

---

4. The other reasons she allegedly continued the relationship would all have been moot before January 1, 1997: she was only on the team through March 1996 and the scholarship arranged by McQuarter was for the fall 1996 term.

5. Under Illinois law, the elements of a claim for intentional infliction of emotional distress are (1) that the conduct involved is truly extreme and outrageous; (2) that the actor either intends that the conduct cause severe emotional distress or knows that there is a high probability that the conduct will cause severe emotional distress; and (3) that the conduct in fact causes severe emotional distress. *McGrath v. Fahey*, 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806, 809 (1988);

*Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir.1993). " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency....' " *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765, 767 (1976) (quoting Restatement (Second) of Torts S 46, cmt. d (1965)). The distress inflicted must be so severe—considering the intensity and duration of the distress—that no reasonable person could be expected to endure it. *McGrath*, 127 Ill.Dec. 724, 533 N.E.2d at 809. Although McQuarter does not move to dismiss count IV for failure to state a claim, we note that the complaint does not include allegations of the kind of extreme and

conclude that Illinois' continuing wrong doctrine does not save this claim from the statute of limitations either.

The statute of limitations for intentional infliction of emotional distress can be found in 735 ILCS 5/13–202, which provides that such claims for "injury to the person" must be brought within two years of the date they accrue. *See Dikcis v. Indopco, Inc.*, 1997 WL 211218 (N.D.Ill.) (*citing Dahl v. Federal Land Bank Ass'n*, 213 Ill.App.3d 867, 872, 157 Ill.Dec. 242, 572 N.E.2d 311, 314 (1991)). Emotional distress claims accrue on the date that the defendant committed the act that allegedly caused the plaintiff's distress. *Id.* In Illinois, however, where a tort involves a continuing or repeated injury, the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease. *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill.App.3d 757, 762–763, 158 Ill.Dec. 335, 574 N.E.2d 129, 132–133 (1991) (citations omitted). A continuing violation is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation. *Id.* Here, even if we read the complaint quite generously, it includes no allegations of *any* conduct by McQuarter after her actions "placing Plaintiff in reasonable fear of losing her university scholarship" for the fall term in 1996 (cplt., ¶ 30). Plaintiff avers that the relationship continued as long as it did because of plaintiff's *own* fear that McQuarter could block her graduation. This is insufficient to allege the kind of continuing wrong identified in *Hyon*.

In *Hertel v. Sullivan*, 261 Ill.App.3d 156, 198 Ill.Dec. 574, 633 N.E.2d 36 (1994), a parishioner filed suit against her priest with whom she had a sexual relationship from 1983 to 1988. Her complaint included claims for negligent and intentional infliction of emotional distress. Plaintiff claimed she was emotionally and financially dependent on the priest, "who controlled her every thought and action." Unlike Turner, who knowingly chose to continue outrageous conduct which would be neces-

an inappropriate relationship to avoid reprisals, Hertel maintained that she did not realize that the priest's conduct was wrongful until she began working with a new therapist in 1991. According to the complaint, "it was not until 1992 that she was emotionally capable of understanding her victimization and taking meaningful action for her own protection." The court rejected plaintiff's argument that the statute of limitations should be tolled under the "continuing course of treatment" or "continuing tort" doctrines. *Id.* at 161–162, 198 Ill.Dec. 574, 633 N.E.2d at 39–40. Even if the discovery rule applied, the court observed that plaintiff had notice of potentially actionable conduct as of 1985, when she alleged she began to suffer from severe depression due to the priest's behavior. The court also agreed with the trial court that none of the conduct alleged after 1988 could be considered tortious. Turner's complaint alleges no specific conduct after January 15, 1997, other than McQuarter's continued participation in the relationship.

We note that "in Illinois, the purpose of a statute of limitations is ... not to shield a wrongdoer; rather it is to discourage the presentation of stale claims and to encourage diligence in the bringing of actions." *Hyon*, 214 Ill.App.3d at 762, 158 Ill.Dec. 335, 574 N.E.2d at 132. If Turner indeed believed that her rights were being violated by McQuarter she should have informed university officials of the impropriety and/or diligently pursued any available legal claims in a timely fashion. Under Turner's own logic, once she had graduated from CSU she was free from any possible reprisals at CSU and could have at that point instituted suit. She did not, and her claims must be dismissed as untimely.

### Conclusion

For the foregoing reasons, plaintiff's complaint is dismissed. Plaintiff has leave to file an amended complaint only if she sary to prevail on this claim.

can provide additional facts which suggest the school defendants "knew" or had "actual knowledge" of any misconduct, or can point to "outrageous" or "extreme" conduct by McQuarter on or after January 15, 1997.