2023 IL App (1st) 221556-U

SECOND DIVISION
September 26, 2023

No. 1-22-1556

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| BINER MA, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | 2019-M1-013640 |
| | ) | |
| U.S. BANK, NATIONAL ASSOCIATION, | ) | Honorable |
| | ) | Christ Stanley Stacey, |
| Defendant-Appellee. | ) | Judge Presiding |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

O R D E R

¶ 1    *Held*: Despite bank's violation of federal banking regulations and its deposit account agreement by holding customer's funds for 43 days, customer was not entitled to interest she allegedly incurred on a loan she received during the period or damages for the bank's purported intentional infliction of emotional distress.

¶ 2    Biner Ma, whose newly opened account at U.S. Bank, National Association (U.S. Bank) was frozen for 43 days and then closed because her first deposit was a check that was returned for non-sufficient funds and raised suspicion of check kiting,[1] sued U.S. Bank, alleging that she

---

[1]    "Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the

suffered financially and emotionally when she could not pay her essential expenses. Ma was awarded $1003 in statutory damages, because the bank was not timely in resolving its account hold (Count I). She did not, however, recover the $600 interest she allegedly incurred by taking a $2400 loan for three months to cover her rent and other living expenses while the account was frozen (Count II). The circuit court also denied Ma's claim for damages for intentional infliction of emotional distress (Count III). On appeal, Ma contends the circuit court misapplied the law and U.S. Bank responds that this plaintiff's claimed damages were neither recoverable nor supported by the evidence she presented.

¶ 3    Ma's amended complaint alleged the following. All of the events at issue occurred in 2019.

¶ 4    On April 30th, Ma opened a checking account in Chicago with U.S. Bank, executed a deposit account agreement, and tendered a $1500 check deposit that she wrote on her account at Byline Bank.

¶ 5    Regulation CC is a federal regulation issued by the Board of Governors of the Federal Reserve System that implements the federal Expedited Funds Availability Act, 12 U.S.C. § 4001 *et seq.* (2018) ("EFFA"), and is about the "Availability of Funds and Collection of Checks," 12 C.F.R. 229 *et seq.* (2018) ("Regulation CC"). Generally, Regulation CC mandates that cash and electronically-deposited funds be available for next-day or second-day withdrawal, although some exceptions may be made, including for deposits made to accounts open for less than 30

kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the 'float' time, an artificial balance is created." United States v. Stone, 954 F.2d 1187, 1188 n.1 (6th Cir. 1992) (business owner alleviated short-term cash flow by kiting checks between two Ohio banks for more than a year, ultimately causing a negative balance of $466k at one bank and his felony conviction for bank fraud and two years in prison).

days. See 12 C.F.R. 229.12 (2018). Regulation CC also requires financial institutions to disclose to account holders when deposited funds will be available for withdrawal, and if the institution extends that time, it must provide the depositor with written notice stating the reason the exception was invoked and when the funds will become available. See 12 C.F.R. 229.13(g) (2018).

¶ 6    Ma's $1500 deposit check was returned unpaid and marked "Not Sufficient Funds." Ma blamed a third financial institution, Emigrant Bank, for its failure to transfer her funds to Byline Bank as she had directed.

¶ 7    On May 2nd, U.S. Bank debited Ma's account with a $19 returned check fee, which created a negative balance for the new account, and sent her a letter stating that because it "suspected irregular activity," it was in the process of closing her account in accordance with the parties' "Deposit Account Agreement." It appears that a closure period instead of an immediate closure was to allow any pending transactions to settle. U.S. Bank's notification also provided, "If the account has a positive balance, a Cashier's Check will be mailed to you within 15 business days once all previously deposited items have been verified." U.S. Bank's letter said nothing about imposing a hold on the account. We set out the full letter as relevant below.

¶ 8    On May 6th, Ma deposited $20 cash to cover the returned check fee. On May 6th or 7th, Ma made a $2300 check deposit by writing a check on her Byline Bank account. Records she obtained from Byline Bank show that the check cleared either that day or the next. On May 6th or May 7th, U.S. Bank also received a $600 electronic direct deposit. The parties' deposit account agreement stated in relevant part, "FUNDS AVAILABILITY: YOUR ABILITY TO WITHDRAW FUNDS – ALL ACCOUNTS *** The following types of deposits will usually be available for withdrawal immediately under normal circumstances: *** Electronic direct

deposits."

¶ 9    Ma went to a branch bank location on May 14th to withdraw funds. She explained to the branch location's assistant manager that Emigrant Bank made a mistake, Ma had no prior negative banking history, and her $2300 Byline Bank check deposit to U.S. Bank had already cleared. The assistant manager spoke with the branch manager and district manager. Nevertheless, Byline Bank would not let Ma make a withdrawal that day and attributed its decision to preventing her from defrauding the bank.

¶ 10    Ma returned to the branch on May 24th, waited for hours, and was then falsely told by the assistant manager that her account balance had been mailed to her. She waited in vain for two weeks for the check to arrive in the mail.

¶ 11    On June 7th, which was well past the time frame set out in U. S. Bank's deposit account agreement and Regulation CC, Ma called two of the bank's phone numbers and pled with numerous employees to release the money that she needed for rent and necessities, including medication. She prepared a complaint to the Consumer Financial Protection Bureau ("CFPB"). It is unclear from the record whether Ma lodged the complaint with the CFPB or only gave it to U.S. Bank. The CFPB is a federal agency that ensures that financial institutions comply with consumer financial laws.

¶ 12    On June 10th, a branch manager called Ma to tell her that he would "reopen" her account to make the funds available. Ma attributed this turn of events to the involvement of the CFPB. On June 11th, she went to a branch to get her money, but she was again turned away. At this point, in order to pay her rent, she had to borrow $2400 from a person who required her to repay the "high cost" loan in three months with $600 interest.

¶ 13    On June 17th, right before its response to the CFPB was due, U.S. Bank closed Ma's

account and mailed her a check for $2921. This amount included Ma's $2300 check deposit and $600 electronic transfer deposit, and a refund of the $20 cash she deposited because of the returned check fee.

¶ 14   In a separate letter, the bank summarized Ma's account history. The chronology suggested that Ma's account had been closed but then "reopen[ed]" and that it remained an active account. The bank, apparently unaware that the entire balance of the account had been refunded to Ma, including the $2300 deposit, provided in its letter that Ma would have to verify the legitimacy of her $2300 check. For the first time, the bank disclosed that it was implementing an account hold:

"We received your request for assistance addressed to the *** [CFPB]. ***

***

Our records indicate that on April 30, a check deposit in the amount of $1,500, which was drawn from Byline Bank, was deposited into your account ending in ***.

*** On May 2, the check was returned as Not Sufficient Funds. Due to the suspected irregular activity, the decision was made to close your account on May 6.

When the account closure process began, notices detailing the closures were mailed to the address we maintained on file. The closure letter also states that if the account has a positive balance, a Cashier's Check will be mailed to you within 15 business days once all previously deposited items have been verified. A copy of the check, along with a copy of the closure letter, are enclosed with this response for your reference.

During the closure process, it was determined that on May 6, an ATM check deposit in the amount of $2,300, which was drawn from Byline Bank, was deposited into your account ending in ***. Due to the previously returned item, we had reason to believe the

funds would not be paid. *Due to this information, the remaining balance of your account will be held until you are able to provide valid documentation proving that this check was valid, and that the funds have cleared from the payer's financial institution.* [(Emphasis added.)]

On June 10, your local Branch Manager Eric Rocks advised you that he agreed to reopen your account and allow you to come in and obtain the remaining funds, with the agreement that you will close your account, following the release of funds. Additionally, Eric agreed to refund you the $19 returned check fee. This credit was posted to your account on June 10 and will be included on your next account statement.

Thank you for taking the time to make us aware of your concerns, and for allowing us to respond. We appreciate the opportunity to serve you and if you have additional questions or concerns, please do not hesitate to contact us at 800.872.2657."

¶ 15 Two days later, Ma filed suit. Ma's amended complaint consisted of three counts. In Count I, Ma alleged that U.S. Bank breached the funds availability clause of the parties' deposit account agreement by not making her funds available by May 7th.

¶ 16 In Count II, she alleged that the bank violated Regulation CC's funds availability requirements for cash and electronic deposits (see 12 C.F.R. §§ 229.10(a), (b); 229.12(b) (Jan. 3, 2019)) by not making her funds available by May 7th. She also alleged that the return of her initial check due to the mistake of another bank was not "reasonable cause" to withhold all of her cash, electronic, and check deposits and that the bank never disclosed the basis for its extended hold of all of her money, in violation of Regulation CC's written notice requirements (see 12 C.F.R. §§ 229.13(e), (g) (Jan. 3, 2019)). Regulation CC provides for the imposition of monetary consequences against a noncomplying bank, including:

"(1) Any actual damage sustained by that person as a result of the failure;

(2) Such additional amount as the court may allow, except that –

(i) In the case of an individual action, liability under this paragraph shall not be less than $100 nor greater than $1,000; and

* * *

(3) In the case of a successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court." 12 C.F.R. § 229.21(a)(1)-(3) (Jan. 3, 2019). See also 12 U.S.C. § 4010 (2018).

¶ 17    Count III was a claim of intentional infliction of emotional distress, in which Ma alleged that the bank's breach of contract and violation of Regulation CC caused her so much emotional distress that she became physically and mentally ill. She alleged that lack of access to her funds made it difficult for her to sleep and eat, caused her eczema to flare up, and put her into a depressed state that took many subsequent months to resolve.

¶ 18    Ma's claimed damages for Counts I through III consisted of:

"a. Financial damages;

b. Emotional distress;

c. Physical sickness;

d. $1000 for multiple violations of Regulation CC, pursuant to 12 U.S.C. § 4010(a)(2) (Ex. 9);

e. Punitive damages as Defendant acted with a wanton disregard of other's rights and the damages it caused on the other for oppression and abuse; [and]

f. Cost[s] and fees, pursuant to 12 U.S.C. § 4010(a)(3) (Ex. 9)."

¶ 19    A three-and-a-half hour bench trial occurred on March 25, 2022. Acting *pro se*, Ma gave

trial testimony that was consistent with her allegations. Of note, is that Ma did not retain an expert medical witness and relied on her testimony, medical records, photos of her face, and several internet page printouts to substantiate her allegations that she suffered severe distress and that her emotional state caused a prominent flare of eczema on her face which was embarrassing and depressing.

¶ 20    The other trial witness was Jannette Duenas, who testified that she had been employed by U.S. Bank for 20 years. As of 2019, Duenas was an assistant vice president and market operations leader, overseeing nine employees in order to "support our [120] branches and operations [in and around Chicago] to make sure that we follow policy and procedure per the U.S. Bank guidelines."

¶ 21    Duenas got involved with Ma's account when a retail branch bank location escalated Ma's complaints. Ma had executed U.S. Bank's deposit account agreement when she opened the checking account. One of the agreement's clauses concerned "RESOLVING ACCOUNT DISPUTES AND ADVERSE CLAIMS," and it stated in relevant part:

> "[I]f we have concerns regarding your account or the use of your account, we have the right to hold any portion of the property in your account until the dispute, claim, or concern is resolved to our satisfaction. We will not be liable to you if the hold we place on your account leaves insufficient funds to cover outstanding items."

¶ 22    Under the "SECURITY" clause, the contract also provided:

> "We reserve the right to place a hold on your account if we suspect irregular, fraudulent, unlawful, or otherwise unauthorized activity involved with your account.· We may attempt to notify you of such a hold, but we are not required to provide notice prior

to placing the hold. You agree that we may maintain such a hold until all claims against you or us to the funds held in your account, whether civil or criminal in nature, have been resolved fully in our sole satisfaction."

¶ 23    According to Duenas, when a customer is depositing a check from an account that they hold at another bank, they should know if their funds are available or not and it is considered a "red flag" when that kind of check is returned. She described check kiting as what occurs when a customer banks at different banks, deposits a check and then "utilize[s] those floating funds from one bank to another." An additional risk was that Ma's dishonored check would be uncollectible.

¶ 24    In order to mitigate risks when there were "red flags," U.S. Bank's direct deposit account fraud department would place a hold on the suspect account, then follow up with an account-closure letter. The hold on Ma's account was placed in part because of her returned check and in part because this was one of the first transactions that posted to the account. When the bank sees "irregular activity, we get in front of it by just moving forward with a closure." U.S. Bank sent Ma its standard letter under the circumstances, stating:

"Dear Customer,

This letter is to inform you that U.S. Bank is in the process of closing the account referenced above for suspected irregular activity, in accordance with the terms and conditions of *Your Deposit Account Agreement.*

Please be advised of the following:

- Pending transactions, such as a Debit Card purchase, may still be cleared on your account.

- The ATM and Debit Cards linked to the account are now disabled.

- If the account has a negative balance, we encourage you to make a cash deposit to bring the account to a zero balance and avoid potential collection efforts.

- If the account has a positive balance, a Cashier's Check will be mailed to you within 15 business days once all previously deposited items have been verified.

- Once the account is closed, items presented for payment will be returned "Account Closed."

U.S. Bank appreciates the opportunity to serve you and regrets the need to take this action. If you have any questions regarding this matter, please contact our branch at (312) 664-5200."

¶ 25    According to the bank's witness, the bank neither intended to cause Ma distress nor had reason to know that implementing the hold would cause her distress.

¶ 26    Normally it will take the bank seven to fifteen days after the last transaction to close an account and return any balance to the customer, but the bank does not commit to a specific timeframe because every account is different. In Ma's case, that would have been seven to fifteen days after the $2300 electronic deposit occurred on May 7, 2019. However, due to a "clerical error," the process stalled until Ma complained to a branch employee in mid June.

¶ 27    On cross-examination, Duenas said that the bank saw irregular activity but not fraud in Ma's account, and that no account dispute, adverse claim, or "security problem" ever arose.

¶ 28    In closing arguments, Ma contended that May 15th was the latest date that she should have had access to the full account balance, pursuant to Regulation CC and the bank's deposit account agreement, and that U.S. Bank "abuse[d] its position as [a] financial institution" by

holding her funds for an additional month.

¶ 29    U.S. Bank responded that it had returned all of Ma's money and was not liable for any of her claimed expenses. It argued that it acted within the law and its contractual rights when it imposed the account hold based only on suspicion of fraud and not actual knowledge of fraud. It cited 12 USC § 4010 (2018) for the proposition that it was not liable for its *bona fide* error. It also argued that Ma had failed to prove any of the elements of her tort claim.

¶ 30    On rebuttal, Ma argued that exculpatory clauses are disfavored and strictly construed and that none of the exculpatory terms excused U.S. Bank's liability for its conduct.

¶ 31    The circuit court then ruled from the bench and entered judgment against Ma. The court found that the bank was entitled to a reasonable period of time to investigate Ma's account and subsequently made a "clerical error resulting in a couple of more weeks of delay." The deposit account agreement exempted the bank from liability for the lengthy account hold and federal law also exempted the bank from the consequences of its "innocent mistakes." As for the tort claim, the evidence showed negligent behavior, but not intentional, malicious, or abusive conduct that was compensable.

¶ 32    Ma filed a motion for reconsideration. On reconsideration, the circuit court reversed its decision as to U.S. Bank's violation of Regulation CC, determining that the bank's witness had given conclusory testimony of a "clerical mistake" and failed to provide a factual explanation of what caused the bank's delay in returning Ma's money. Accordingly, the bank's breach of Regulation CC could not be excused as an innocent or honest mistake and Ma was entitled to statutory damages of $1003 "plus filing fees and costs of service." The $1003 consisted of one month's interest on the funds held longer than allowed under federal law, which the court

calculated was $3, and the maximum "additional amount" that the court could award for violating Regulation CC, which was $1000. The court declined to disturb its decision on the breach of contract and tort counts. The circuit court subsequently issued an amended order of reconsideration only to correct the case number and other minor errors.

¶ 33    This appeal followed.

¶ 34    Ma focuses on recovering the $600 interest that she purportedly paid on the short-term loan she received from another party while she could not access her checking account. She contends the circuit court erred by classifying the interest as special damages. When denying reconsideration of Ma's breach of contract count, the circuit court said in its amended order:

> "Plaintiff also claims as an element of damages the special damage of the exorbitant interest ($600) charged to her by a member of her community to borrow [$2400] for the lending of funds so that plaintiff could pay her rent and other expenses. *** In Illinois, 'special damages' are limited to those which were reasonably foreseeable and were within the contemplation of the parties at the time the contract was executed. *Kalal v Goldblatt Brothers, Inc.*, [53 Ill. App. 3d 109, 113 (1977)]. There is no evidence that the bank was aware that these particular funds were specifically earmarked for rent at the time the parties entered the bank depository agreement."

¶ 35    Ma cites Illinois Pattern Jury Instructions, Civil, No. 700.13 (2022) for its statement that damages for breach of contract can be classified into direct, special and incidental damages, and while special damages must be reasonably foreseeable by the parties at the time of contracting, incidental damages are those costs reasonably spent either in responding to a breach of contract or in securing the benefits that were to be provided by the contract. Ma contends that the interest

charges were properly classified as compensable incidental damages and that the $600 was money "reasonably spent" in response to the "extreme money difficulty" that she experienced due to the bank's breach of contract.

¶ 36    She cites a legal dictionary for its definition of "actual damages" and other authority that generally states that actual damages that are established by the evidence are what is compensable. She contends that she is entitled to recover all of her actual damages.

¶ 37    Ma is presenting a question of law, which we address *de novo. Fox v. Heimann*, 375 Ill. App. 3d 35, 44 (2007).

¶ 38    While Ma's argument is clear, it lacks adequate support to authority. She cites no precedent in which a court categorized damages as either direct, special or incidental and we cannot rely on her subjective opinion that the $600 interest was improperly classified as special damages when it is really incidental damages. She has failed to provide a basis for concluding that the circuit court erred in its classification of the $600 fee. It is not the responsibility of the appellee or this appellate court to research the relevant law in order to develop and then refute or agree with Ma's argument. Rule 341(h)(7) requires the appellant to present reasoned argument, and citation to relevant legal authority (as well as specific portions of the record) in support of the claims of error. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). An appellant's failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned argument violates Rule 341(h)(7) and results in forfeiture of that argument. *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009). We find that Ma's argument is forfeited due to her failure to cite relevant supporting authority.

¶ 39    Forfeiture aside, even if we assume *arguendo* that the damages were misclassified, Ma would never prevail on her claim to recover the $600 interest. She fails to overcome the liability

limitation that she accepted when she opened the checking account at U.S. Bank. There is no indication in the record that when Ma opened the account and signed the bank's deposit account agreement, the parties were contemplating that the bank would bear any expenses that Ma subsequently experienced if the bank erred. In fact, by executing the agreement, Ma expressly agreed "to the extent allowed by law–to waive any indirect, *incidental*, *special*, consequential and punitive damages for errors or mistakes [U.S. Bank] make[s] in good faith." (Emphasis added.) According to Illinois law, an unambiguous limitation on liability is fully enforceable. *Creamer v. State Farm Mutual Automobile Insurance Co.*, 161 Ill. App. 3d 223, 224 (1987). According to this contract language, regardless of whether the $600 interest is deemed incidental damages as Ma argues it should be or special damages as the circuit court categorized it, as long as the claim is attributed to an error or errors that U.S Bank made in good faith, Ma waived her right to recover the interest charge from the bank. The circuit court expressly found that the hold on Ma's account was an innocent mistake. In our opinion, acting in good faith and making an innocent mistake have similar meanings. See Black's Law Dictionary (11th ed. 2019) (defining "acting in good faith" as "Behaving honestly and frankly, without any intent to defraud or to seek an unconscionable advantage"); *Merchants Environmental Industries, Inc. v. SLT Realty Ltd. Partnership*, 314 Ill. App. 3d 848, 862-63 (2000) (indicating waiver of a lien requires innocent and good faith reliance); *Estes v. Smith*, 244 Ill. App. 3d 681, 684-85 (1993) (indicating the elements of equitable estoppel include "a reasonable, good faith, detrimental change of position by the innocent party"). We find that by signing the deposit account agreement with the bank, Ma gave up her right to recover the $600 interest that she attributed to the bank's breach of contract, regardless of whether the $600 fee was properly classified as special or incidental damages.

¶ 40    Ma next contends the circuit court erred by rejecting her tort claim. In a bench trial, the circuit court weighs the evidence and makes findings of fact. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. " 'The court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)).

¶ 41    In order to recover under the tort theory of intentional infliction of emotional distress, a plaintiff must plead and prove three elements: (1) the conduct involved was extreme and outrageous; (2) the conduct was intended to inflict severe emotional distress, or the actor knew there was a high probability that the conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. *Feltmeier v. Feltmeier,* 207 Ill. 2d 263, 269 (2003) (citing *McGrath v. Fahey,* 126 Ill. 2d 78, 86 (1988)). All three elements are necessary to sustain the cause of action. *Feltmeier*, 207 Ill. 2d at 268.

¶ 42    Whether conduct is extreme and outrageous is evaluated on an objective standard based on all the facts and circumstances pled and proven in a particular case. *McGrath,* 126 Ill. 2d at 90.

> "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

Restatement (Second) of Torts § 46 (1965); *Feltmeier*, 207 Ill. 2d at 274. See *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 447 (2005) (indicating liability attaches where conduct was atrocious and utterly intolerable in a civilized community).

¶ 43   Liability is unwarranted for conduct that merely rises to the level of " 'insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *McGrath*, 126 Ill. 2d at 86 (quoting (Restatement (Second) of Torts § 46, comment *d,* at 73 (1965).) However, "A pattern, course, [or] accumulation of acts" could be considered outrageous conduct even where an individual instance of the same conduct may not. *Feltmeier*, 207 Ill. 2d at 274. Ma emphasizes that one of the factors to be taken into consideration when determining whether conduct may be deemed outrageous is whether the defendant was in a position of power to affect the plaintiff's interests and abused that power. *McGrath*, 126 Ill. 2d at 88.

"[T]he degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous. The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment. Threats, for example, are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out then when made by someone in a comparatively weak position. The Restatement mentions police officers, school authorities, landlords and collecting creditors as examples of the many types of individuals who may be positioned to exercise power or authority over a plaintiff. *McGrath*, 126 Ill. 2d at 86-87 (citing Restatement (Second) of Torts § 46, comment *e*, at 74 (1965)).

¶ 44     In addition to considering the defendant's power over the plaintiff, other factors which indicate that conduct is extreme and outrageous are whether the defendant reasonably believed that the conduct was done to achieve a legitimate objective (*McGrath*, 126 Ill. 2d at 88), and whether the defendant was aware that the plaintiff was "particularly susceptible to emotional distress." *McGrath*, 126 Ill. 2d at 89-90; *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 21 (1992) ("Behavior that might otherwise be considered merely rude, abrasive or inconsiderate, may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional distress."). The presence or absence of any of these factors is not critical. *McGrath*, 126 Ill. 2d at 90. A determination of whether the defendant's conduct was outrageous requires the court to consider all the facts and circumstances of the particular case. *McGrath*, 126 Ill. 2d at 90.

¶ 45     Ma argues that "as a financial institution, the bank had the actual power of Ma to control her money and damage her interest."

¶ 46     We will consider U.S. Bank and Ma's interaction in light of *McGrath*, in which the court held that a bank customer adequately stated a cause of action for intentional infliction of emotional distress against a bank and its president. *McGrath*, 126 Ill. 2d at 78.

¶ 47     The bank and its president were alleged to have used their position of authority over the customer and his assets as part of an extended and coercive scheme to wrongfully obtain millions of dollars from him and his business partner. *McGrath*, 126 Ill. 2d at 90. According to the complaint, the defendants initially defrauded the customer and his business partner in connection with a complex real estate contract, causing them to lose $4 million. *McGrath*, 126 Ill. 2d at 82. The defendants then allegedly "engaged in conduct very much akin to extortion," by refusing to allow the customer to withdraw funds on ten matured certificates of deposit (CD) that they knew

- 17 -

had no connection to the real estate transaction. *McGrath,* 126 Ill. 2d at 91. Instead, "without any tenable legal justification whatsoever," the defendants conditioned release of those funds on the customer's assignment of certain second mortgages to the defendant bank. *McGrath,* 126 Ill. 2d at 91. These mortgages would have partially compensated the customer for surrendering the real estate. *McGrath*, 126 Ill. 2d at 91. The defendants threatened to keep the funds for five years and to financially ruin the customer and his medical practice if he did not comply with their demands. *McGrath*, 126 Ill. 2d at 92. After the parties' lawyers agreed that the CD funds would be released, the defendants impeded two of the customer's checking accounts and an insured money market fund that had no connection to the real estate contract. *McGrath*, 126 Ill. 2d at 92. They refused to honor eight checks written on the accounts, despite giving assurances that they would and even though there were adequate funds in the accounts to cover the drafts. *McGrath*, 126 Ill. 2d at 85. Moreover, the defendants persisted in this campaign of coercive conduct after being informed that the customer was susceptible to heart disease and, in fact, after he had a severe heart attack and underwent open-heart surgery. *McGrath,* 126 Ill. 2d at 92. They even telephoned him on several occasions while he was at home recuperating from the surgery as part of their efforts to pressure him into assigning the second mortgages. *McGrath,* 126 Ill. 2d at 92. Although the circuit court dismissed the plaintiff's complaint for failure to state a cause of action, the intermediate and supreme appellate courts determined that "a jury could legitimately find defendants' conduct so outrageous to support a claim." *McGrath*, 126 Ill. 2d at 92.

¶ 48     There are significant differences between the current case versus the allegations in the *McGrath* case that resulted in the court finding an actionable pattern of extreme and outrageous conduct. The record indicates that U.S. Bank was initially justified in placing a hold on Ma's new checking account due to the terms of its deposit account agreement and its suspicions of

check kiting, but subsequently, the bank retained the proceeds of Ma's $2300 check and her $600 electronic transfer for about one month longer than it should have. U.S. Bank never threatened or attempted to coerce Ma to act against her own financial interests. In fact, there was no indication that the bank acted intentionally. Instead, Ma's allegations about her interactions with the bank personnel suggest a misunderstanding over the nature of the funds in her new account coupled with indifference to rectifying that problem. However, due to Ma's persistence over that month and her willingness to involve the CFPB, bank personnel eventually corrected the situation by mailing Ma a cashier's check for the full account balance and even refunded the dishonored check fee that Ma insisted had been wrongfully assessed because of a third bank's error. We do not characterize the bank's interactions with Ma and delayed resolution as a pattern or accumulation of acts that could be considered outrageous. A month of misunderstanding and indifference which culminated in the return of Ma's funds is not comparable to the deliberately coercive and abusive conduct in *McGrath* that was intended to defraud the customer of his money.

¶ 49    We come to this conclusion despite Ma's allegations and testimony that her financial state was so stressful that she manifested physical problems that she said included a humiliating and depressing bout of facial eczema. Undoubtedly, the situation was stressful, but an objective person would not conclude that U.S. Bank engaged in a course of extreme and outrageous conduct. See *McGrath,* 126 Ill. 2d at 90 (indicating an objective person standard should be used). Despite Ma's arguments, the record does not indicate that the opposite conclusion is apparent or that the circuit court's findings are unreasonable, arbitrary, or not based on the evidence. See *Eychaner*, 202 Ill. 2d at 252.

¶ 50    The other authority that Ma cites regarding the intentional infliction of emotional distress,

*Honaker v. Smith*, 256 F.3d 477 (7th Cir. 2001), is not binding on this state court because it is a federal opinion. *Riemer v. KSL Recreation Corp.*, 348 Ill. App. 3d 26, 40 (2004) (federal opinions are only persuasive authority, not controlling authority, in state court). Furthermore, the case is readily distinguishable on its facts because it involved a homeowner who alleged that his house burned down because the local mayor, who was also the fire chief, intentionally set the structure on fire and then withheld efforts to extinguish the blaze.

¶ 51    As Ma did not plead and prove the first element of a claim for the intentional infliction of emotional distress, we need not address the sufficiency of the remaining elements. See *Feltmeier*, 207 Ill. 2d at 268 (all three elements are necessary); *Schiller*, 357 Ill. App. 3d 435 (where plaintiffs had not pled sufficient facts to establish the first element of an intentional infliction of emotional distress claim, court did not examine the remaining two elements).

¶ 52    For these reasons, the decision of the circuit court is affirmed.

¶ 53    Affirmed.